# REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA *v.* CARROLL ET AL.

No. 83.  Argued December 9, 1949.—Decided February 6, 1950.

*Hamilton Lokey,* Deputy Assistant Attorney General of Georgia, argued the cause for petitioner. With him on the brief was *Eugene Cook,* Attorney General.

*James A. Branch* argued the cause for respondents. With him on the brief was *Thomas B. Branch, Jr.*

By special leave of Court, *Max Goldman* argued the cause for the Federal Communications Commission, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Perlman, Stanley M. Silverberg, Benedict P. Cottone* and *Richard A. Solomon.*

MR. JUSTICE REED delivered the opinion of the Court.

The Federal Communications Commission renewed a radio license only after the applicant, the Board of Regents, carried out a required repudiation of a contract with other persons, respondents here. The Commission had determined that unless the contract were given "no further effect" a renewal of the license would not be in the public interest. This was based on findings that the

contract seriously jeopardized the applicant's financial position and that it allowed the other persons to profit from a situation created by a previous contract with the applicant that the Commission had held illegal. May a state now enforce the repudiated contract against the applicant although this would have the practical effect of nullifying the repudiation required by the Commission? That is the federal question presented in this proceeding.

The question arises in this way. The Georgia School of Technology received radio station WGST in 1923 as a gift. Petitioner [1] operated the station until January 1930, when it made a contract with the Southern Broadcasting Company for the operation of the station. The contract was to run for a ten-year period, and the company was to receive all the earnings of the station except a percentage of the gross receipts. This percentage, which varied up to 10%, was to be paid Regents. Southern Broadcasting Stations, Inc., of which respondents are the former stockholders, succeeded to the rights of the company. The contract was extended for a period to end January 6, 1950. On execution both the original contract and the extension were filed with the Commission. 10 F. C. C. 110, 114.

Various renewals of petitioner's license were made during this period, but when petitioner applied for a renewal

---

[1] As nothing of importance in this case turns upon the details of title, we hereafter refer to the petitioner as petitioner or Regents. We treat it as owner, applicant for license or licensee. Contracts for the operation of WGST were made by the Board of Trustees of the Georgia School of Technology until by state legislation management of the School affairs passed from that Board to the Board of Regents of the University System of Georgia. Thereafter the Regents handled the station for the School. The applications for license have been made and the licenses issued in the name of the Georgia School of Technology.

in 1940, the Federal Communications Commission ordered a hearing to determine whether the contract arrangement constituted a violation of the Federal Communications Act and whether renewal of the license to petitioner would serve the public interest, convenience and necessity. Southern was permitted to intervene in the proceeding.

The Commission found that although the contract provided that its execution should not release the licensee from its right and duty to maintain general control over the station, actually petitioner had exercised only nominal authority. The contract itself stipulated that Southern should arrange the programs and attend to all program details. In the operations under the contract Southern had purchased additional equipment and apparatus without consulting with petitioner, and since 1930 nothing had been spent by petitioner for purchase or maintenance of the equipment. Southern had contracted in its own name with buyers of broadcasting time and for network service.

From these facts the Commission determined that Southern's operation of petitioner's station violated the Commission's rule that a licensee must be responsible for the control and operation of the station, and that a licensee may not transfer to any person its responsibility as licensee except with the Commission's written consent. It also held that the Communications Act of 1934 had been violated.[2]

---

[2] 10 F. C. C. 110, 120. The Commission based its ruling particularly on its interpretation of the rule in F. C. C. Rules & Regulations § 1.364 (Part I, Revised to Feb. 1, 1945), and on §§ 301, 307, 308, 309 and 310 of the Communications Act (47 U. S. C.). It also called attention to the application form for renewals, one of the questions on which, No. 11c, asked: "Does applicant have absolute control of station, both as to physical operation and programs broadcast?"

The Commission issued proposed findings of fact and conclusions of law on March 23, 1943. This decision refused the application for renewal of the license. It said, however, that "The Commission will consider the issuance of a renewal of the license to Georgia School of Technology provided the Commission is given assurance that the applicant is prepared to and will in fact assume and discharge the full responsibilities of a licensee." 10 F. C. C. at 121. It permitted temporary continued operation. The proposal was adopted by the Commission May 8, 1943. No appeal was taken by petitioner or respondents from this order. See 47 U. S. C. § 402.

In order to obviate the Commission's objection to Southern's operation of the station, petitioner on April 15, 1943, entered into the contract here in issue. Under it petitioner purchased from respondents all the shares of stock of Southern, and, as the consideration, agreed to pay each month a sum equal to 15% of the net billings[3] of the station until January 6, 1950. Petitioner proceeded to liquidate Southern and to transfer the assets, consisting of station equipment, broadcasting contracts and sundries, to itself in trust for the Georgia School of Technology. Since July 9, 1943, petitioner has itself managed, directed and controlled the affairs of the station.

On May 23, 1943, petitioner filed another application for renewal of its license. While respondents had actual knowledge of this second proceeding, they were never parties to it by intervention or otherwise. After hearings, the Commission held that the public interest, convenience or necessity would not be served by a grant of the application. Estimating that under the new contract petitioner would be paying out 70% of the net earnings

---

[3] *I. e.*, the sales of broadcasting time less commissions or disbursements to others.

of the station, it found that petitioner's financial ability to conduct the station in the public interest would be jeopardized. It was concerned especially because it thought that the use of so much of the station income for the contract obligations would lessen the station's ability to enter the fields of FM and television. The Commission also found that the contract represented an effort to give further effect to the earlier managerial arrangements, which it had held violative of the Act and its regulations. It thought that the agreed price for the stock—estimated at over $300,000—was excessive because the equipment had only an estimated value of $50,000. Southern's title to that was questionable, and Southern had no "legal interest" in the operation of the station. While the Commission did not undertake to pass upon the validity of the stock purchase contract as a matter of contract law, it concluded (11 F. C. C. 71, 76):

> "A grant of the renewal application under circumstances where a party to an arrangement found by the Commission to be in contravention of law would continue to profit from such arrangement would not be in the public interest since it would, in effect, condone such illegality and thwart the Commission's efforts to enforce the requirements of the act."

The Commission on September 19, 1945, again denied the application, but it allowed the petitioner to continue operations and to make a new application, provided it should affirmatively show "that no further effect is given to the agreements" between petitioner and respondents. One of these agreements is the stock purchase contract involved in this present litigation.

Thereupon, the Regents on October 11, 1945, adopted a resolution repudiating the stock purchase contract, and added a copy of the resolution to its pending applica-

tion for renewal of its license.[4] By a statement attached to its application, the Regents informed the Commission that respondents had been notified of the resolution and announced that no settlement would be made with respondents without Commission approval.[5] Respondents do not deny notice of the repudiation. On March 7, 1946, the Commission issued to petitioner the requested license, and has since renewed it for the period ending May 1, 1950. Thus petitioner has been able to operate its station without interruption throughout the years.

Until the repudiation, the agreed payments had been made under the contract. After the notice to respondents petitioner made no further payments, nor did it at any time, so far as the record indicates, make any effort or offer to return to respondents the property and the

[4] "Resolved, by the Board of Regents of the University System of Georgia that the ruling of the Federal Communications Commission having made the contract with the stockholders of Southern Broadcasting Stations, Inc. legally impossible of performance, the board hereby approves the action of its WGST Radio Committee in directing that said contract be not further complied with. This action is taken without prejudice to a fair adjustment or settlement of whatever rights the said stockholders may have, subject to the approval or consent of the Federal Communications Commission."

[5] "The agreement effective April 15, 1943, was cancelled by the Regents of the University System of Georgia by resolution adopted at a meeting of the Board of Regents held on October 11, 1945. A true and correct copy of the resolution is hereto attached as Exhibit J. The other parties to the agreement have been notified orally of the cancellation of the agreement and no payments under the agreement have been made since the issuance of the proposed decision of the Commission in Docket No. 6534 on September 20, 1945. The Board of Regents will not undertake to negotiate any adjustment or settlement with the other parties to the agreement unless and until said parties first obtain the approval or consent of the Federal Communications Commission to negotiate a settlement of whatever rights said parties may have under the agreement."

intangible assets acquired through the contract. The Regents cannot now restore the parties to their former position. The proceeding on review was brought by the respondents for an accounting on the contract in the Superior Court of Fulton County, Georgia, in June, 1947, for the sums accruing from August, 1945.

Petitioner defended the action on the ground that to permit recovery would be an interference with the Commission's power over broadcasting. It also contended that the Commission's requirement of disaffirmance made the purchase contract impossible of performance.[6] The case was submitted by stipulation and documentary evidence, and there was no conflict as to the facts. The trial court entered a judgment for the amounts due under the contract through August, 1947, some $145,000. The court held that "The Federal Communications Commission was without jurisdiction to nullify, change or anywise modify the duties and obligations of the parties to the contract of April 15, 1943." It also decided that the Commission order requiring disaffirmance of the purchase contract "does not constitute a valid defense or bar as a matter of fact or law to the right of the plaintiffs to enforce the provisions of the contract of April 15, 1943, on the ground that said order has rendered performance

[6] There are further allegations of defense in the answer that may be summarized as a statement that respondents had actual knowledge of the filing of the renewal application that resulted in issuance of the license; that respondents had actual knowledge of the hearings, of the proposed decision and of the final order of the Commission. The petitioner further alleged that respondents knew the operation of the station depended upon the grant of a license.

We consider these allegations as to notice only as they bear upon the effect of the Board order on petitioner's responsibility under the contract. Petitioner did not plead them as an estoppel to recovery. Neither of the Georgia courts treated the allegations as a basis of estoppel under the law of Georgia. This would be a matter of state law.

on the part of the defendant Board of Regents impossible."

The Court of Appeals of Georgia accepted the trial court's determinations and affirmed.[7]   Since an important question of the relation of federal administrative power to state judicial power was involved, we granted certiorari.   338 U. S. 846.

We may summarily dispose of the defense of impossibility of performance.   It is a matter of state law.   It was a defense made in a state court to a contract entered into under the law of Georgia.   Since petitioner actually was an operating licensee up to the entry of the judgment, the state court thought petitioner remained liable under the contract.

Whatever power the Federal Communications Commission had to affect the rights of the parties under these contracts rests on the Communications Act of 1934 and its amendments.   The sections pertinent to the determination of this case appear in the margin.[8]

---

[7] 78 Ga. App. 292, 50 S. E. 2d 808 (cert. by the Sup. Ct. of Georgia denied, 78 Ga. App. 898).

[8] 47 U. S. C.:

§ 151. "For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make [it] available, so far as possible, to all the people of the United States . . . there is created a commission to be known as the 'Federal Communications Commission' . . . ."

§ 154. "(i) The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions."

§ 301. "It is the purpose of this chapter, among other things, to maintain the control of the United States over all the channels of interstate and foreign radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license.   No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio . . . , except under and in accordance

To lay bare the controlling issue in this case, we can remove several matters from discussion as not significant to our decision. There is no challenge to the Commission's ruling that Southern's operation of the station vio-

with this chapter and with a license in that behalf granted under the provisions of this chapter."

§ 303. "Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

.        .        .        .        .

"(r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, . . . ."

§ 307. "(a) The Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this chapter, shall grant to any applicant therefor a station license provided for by this chapter."

§ 307. "(d) . . . but action of the Commission with reference to the granting of such application for the renewal of a license shall be limited to and governed by the same considerations and practice which affect the granting of original applications."

§ 308. "(b) All such applications shall set forth such facts as the Commission by regulation may prescribe as to the citizenship, character, and financial, technical, and other qualifications of the applicant to operate the station; . . . ."

§ 309. "(a) If upon examination of any application for a station license or for the renewal or modification of a station license the Commission shall determine that public interest, convenience, or necessity would be served by the granting thereof, it shall authorize the issuance, renewal, or modification thereof in accordance with said finding. . . ."

§ 310. "(b) The station license required, the frequencies authorized to be used by the licensee, and the rights therein granted shall not be transferred, assigned, or in any manner either voluntarily or involuntarily disposed of, or indirectly by transfer of control of any corporation holding such license, to any person, unless the Commission shall, after securing full information, decide that said transfer is in the public interest, and shall give its consent in writing."

§ 312. "(a) Any station license may be revoked for false statements either in the application or in the statement of fact which may be required by section 308 of this title, or because of conditions

lated § 310 (b) and the regulations in that it constituted a transfer of the licensee's responsibilities without consent of the Commission.[9] We assume its soundness. Similarly we accept the ruling that the payments contemplated under the stock purchase contract made the petitioner financially unacceptable as a licensee,[10] and we assume the validity of the Commission's conclusion that petitioner might be denied a license because the price promised respondents under the stock purchase contract permitted them to profit from their prior invalid arrangement.[11] Thus our inquiry is narrowed to the point of whether in the light of the Supremacy Clause of the Constitution a state may enter a judgment that grants respondents a recovery on the very stock purchase contract that justified the Commission's refusal of a license.[12]

---

revealed by such statements of fact as may be required from time to time which would warrant the Commission in refusing to grant a license on an original application, or for failure to operate substantially as set forth in the license, or for violation of or failure to observe any of the restrictions and conditions of this chapter or of any regulation of the Commission authorized by this chapter or by a treaty ratified by the United States: . . . ."

§ 405. "After a decision, order, or requirement has been made by the Commission in any proceeding, any party thereto may at any time make application for rehearing of the same, or any matter determined therein, and it shall be lawful for the Commission in its discretion to grant such a rehearing if sufficient reason therefor be made to appear: . . . ."

[9] 10 F. C. C. 110, 120; 11 F. C. C. 71, 76.

[10] 11 F. C. C. 71 at 75; see § 308 (b), note 8. See *Federal Communications Commission* v. *Sanders Radio Station*, 309 U. S. 470, 475.

[11] 11 F. C. C. 71, 76.

[12] The Georgia court similarly conceived the issue:

"The Federal Communications Commission is an administrative agency of the Federal Government, empowered to enforce the provisions of the Communications Act of 1934 (47 U. S. C. A., § 151, et seq.), and has the power and authority to grant or refuse licenses to radio-broadcasting stations, with a view to subserving the

Our former decisions interpretative of the Communications Act furnish a basis for examining this question. As an administrative body, the Commission must find its powers within the compass of the authority given

public interest so that the people shall have the best possible radio service; but nothing in the power granted to the commission, or in said communications act of Congress, gives to the commission the power and authority to regulate the private contracts and business of those operating radio-broadcasting stations, where the same is not necessary in the protection of the public interest, and where such contracts do not affect the interstate transactions of the radio station." 78 Ga. App. 292, 50 S. E. 2d 808, 809.

"The Federal Communications Commission has power in the 'public interest' under said act to refuse licenses to stations which engage in practices contrary to the public interest, convenience, or necessity. In each case that comes before it, the commission must exercise ultimate judgment whether the grant of a license in the particular instance would serve the public interest, convenience or necessity. . . .

"The Federal Communications Commission has the power and authority in granting a license to a radio station to see that the public interest and convenience are subserved thereby, and an important element of public interest and convenience affecting the issue of a radio-broadcasting license is the ability of the licensee to render the best practicable service to the community reached by his broadcasts. The commission must see to it that all applicants for radio-station licenses have the necessary technical ability to broadcast programs, and that the stations are properly constructed and properly and adequately manned and do not interfere with other stations, and that all licensees are responsible, morally and financially. . . ." 78 Ga. App. 298–99, 50 S. E. 2d 812, 813.

". . . Matters of private concern, and contracts affecting such rights, which do not have as their subject-matter the rights conferred by a license, or do not substantially affect such rights, are not within the scope of the commission's power to regulate and control in the public interest broadcasting by radio stations and licenses to such stations. . . ." 78 Ga. App. 300, 50 S. E. 2d 813.

There is some language in the opinion (78 Ga. App. 292, 302, 50 S. E. 2d 808, 814) from which it might be inferred that the Court of Appeals thought that it could review the conclusion of the Commission that the issuance of the license with the contract in effect would adversely affect the public interest. In view of the statements above

it by Congress.[13]  When to assert its undoubted power
to regulate radio channels,[14] Congress set up the Federal
Communications Commission, it prescribed licensing as
the method of regulation.  47 U. S. C. § 307.  In its
action on licenses, the Commission is to be guided by
what we have called the "touchstone" of "public con-
venience, interest, or necessity." [15]  Since the licensee re-
ceives no rights in the channel beyond the term of its
license, the Commission may grant a license to a com-
petitor even though it results in an economic injury to
an existing station.[16]  Although the licensee's business as
such is not regulated, the qualifications of the licensee
and the character of its broadcasts may be weighed in
determining whether or not to grant a license.  *Federal
Communications Commission* v. *Sanders Radio Station,*
309 U. S. 470, 475; *National Broadcasting Co., Inc.* v.

and the general tenor of the opinion, we are satisfied that the Court
of Appeals did not claim a power to decide the contract's effect upon
an applicant's ability to meet the requirements necessary for a license
from the Commission.  The Court of Appeals bottomed its decision
on the lack of power in the Commission to affect legal responsibility
under this contract.

[13] *American School of Magnetic Healing* v. *McAnnulty,* 187 U. S.
94, 110; *Helvering* v. *Sabine Trans. Co.,* 318 U. S. 306, 311; *Addison*
v. *Holly Hill Co.,* 322 U. S. 607, 617–18; *Ashbacker Radio Corp.* v.
*F. C. C.,* 326 U. S. 327, 333, dissent, 335.  Cf. § 9 (a) Administrative
Procedure Act, 60 Stat. 242:

"SEC. 9. In the exercise of any power or authority—

"(a) IN GENERAL.—No sanction shall be imposed or substantive
rule or order be issued except within jurisdiction delegated to the
agency and as authorized by law."

[14] *Federal Radio Commission* v. *Nelson Bros. Co.,* 289 U. S. 266,
279; *National Broadcasting Co., Inc.* v. *United States,* 319 U. S. 190,
210.

[15] *Federal Communications Comm'n* v. *Pottsville Broadcasting Co.,*
309 U. S. 134, 138; *National Broadcasting Co., Inc.* v. *United States,*
319 U. S. 190, 216.    47 U. S. C. § 307 (a).

[16] *Federal Communications Commission* v. *Sanders Radio Station,*
309 U. S. 470, 473, 475, 476.

*United States,* 319 U. S. 190, 218, 227. These cases make clear that the Commission's regulatory powers center around the grant of licenses. They contain no reference to any sanctions, other than refusal or revocation of a license, that the Commission may apply to enforce its decisions.[17]

*Radio Station WOW, Inc.* v. *Johnson,* 326 U. S. 120, which required an examination into the respective powers of state courts and the Communications Commission, is particularly applicable to this case. The owner of licensed station WOW had leased the facilities for a term of years and had secured approval from the Commission of a transfer of the license to the lessee. The state courts set aside the lease for fraud and ordered a retransfer of the physical facilities to the lessor. The essential holding, so far as it relates to our present problem, lies in these words at p. 131:

> "We have no doubt of the power of the Nebraska court to adjudicate, and conclusively, the claim of fraud in the transfer of the station by the Society to WOW and upon finding fraud to direct a reconveyance of the lease to the Society. And this, even though the property consists of licensed facilities and the Society chooses not to apply for retransfer of the radio license to it, or the Commission, upon such application, refuses the retransfer. The result may well be the termination of a broadcasting station."

In the *WOW* case, the Commission had not passed upon the question of fraud, but if at the time of the state adjudication there had been a finding by the Commission

---

[17] The Communications Act has no provision such as appears in the National Labor Relations Act, § 10 (c), 49 Stat. 454, authorizing the Labor Board to require affirmative action from those who violate the Labor Act. Yet, even in cases under that Act, third persons were left free to assert rights under their contracts. *National Licorice Co.* v. *Labor Board,* 309 U. S. 350, 365.

that the facts did not justify a refusal to transfer the license, this finding would not have affected the right of the state court to determine independently the issue of fraud.

We now come to consider the arguments put forward to show that under the Act the Commission's orders are effective to bar recovery. One suggestion is that petitioner's position has a specific statutory basis in § 303 (r), which permits the Commission to prescribe such "conditions" as are "necessary to carry out the provisions" of the Act. We do not think the suggestion is sound. Congress has enabled the Commission to regulate the use of broadcasting channels through a licensing power. It is in connection with this power that § 303 (r) is to be interpreted. The Commission may impose on an applicant conditions which it must meet before it will be granted a license, but the imposition of the conditions cannot directly affect the applicant's responsibilities to a third party dealing with the applicant.

Petitioner also urges that a state court judgment should not be allowed to thwart the Commission's efforts to enforce the requirements of the Act.[18] Since the Communications Act does not specifically empower the Commission to adjudicate the contractual liability of a licensee for its contracts or to declare a licensee's contracts unenforceable in the courts, for this defense petitioner must depend upon general implications from the Act.

The argument is that if before it issues a license the Commission cannot be assured that it has secured an effective cancellation of a contract like the one in suit, it must choose between two undesirable alternatives. It must either condone the violation of its rules for operation and forsake its duty to insure that only the financially

---

[18] 11 F. C. C. 71, 76.

able may be licensees, or it must deprive the public of the advantage of a station under the management of the Board of Regents.

The renewal application indeed presented the Commission with a hard choice. For ten years the operating arrangement had continued. Suddenly, after the station had been brought to a favorable profit position under Southern's management, the Commission became conscious of the violation of law involved in the management contract. When the management contract was superseded by the purchase contract, the Commission insisted that petitioner could not be a suitable licensee unless the latter contract were given "no effect." For some reason, which has not been explained to us, the Commission was satisfied that the contract was of "no effect" when the petitioner made a unilateral disaffirmance, and it did not think it necessary to require that Southern agree to the cancellation before a license would issue.

This choice of method lay within the Commission's power. Considerations unknown to us may have dictated this procedure. Before issuing a license in similar cases, however, the Commission has successfully obtained from both parties to a contract clear and unequivocal assent to its cancellation.[19] Indeed, the Commission might refuse to issue a license until the applicant has demonstrated that it has been freed by the state courts from the obnoxious contract.[20]

But if the Commission was placed in a dilemma from which it had no escape, that dilemma was the inevitable result of the statutory scheme of licensing. The Com-

---

[19] *Matter of Westinghouse Electric and Manufacturing Co.*, 8 F. C. C. 195; *In re Cornell University (WHCU)*, Docket No. 5820 (Order, Oct. 15, 1940).

[20] See *Matter of the City of Camden (WCAM)*, 4 Pike and Fischer Radio Regulations 344, 384.

mission itself has indicated to Congress that it is embarrassed by its inability to issue cease and desist orders, that it has at its disposal only the cumbersome weapons of criminal penalties and license refusal and revocation.[21] But, so far as we are aware, the Commission request did not go beyond asking for power to issue a cease and desist order against a licensee. No power was sought against a third party. Under the present statute, the Commission could make a choice only within the scope of its licensing power, i. e., to grant or deny the license on the basis of the situation of the applicant. It could insist that the applicant change its situation before it granted a license, but it could not act as a bankruptcy court to change that situation for the applicant. The public interest, after all, is in the effective use of the available channels, and only to that extent in what particular applicant receives a license.[22] The Commission has said frequently that controversies as to rights between licensees and others are outside the ambit of its powers.[23] We do not read the Communications Act to give authority to the Commission to determine the validity of contracts between licensees and others.

Finally, we find irrelevant the fact that respondents had knowledge of the Commission proceeding denying a license unless the stock purchase contract were given "no effect." Even if we should assume that respondents had the right to intervene in that proceeding and to

---

[21] Hearings before a Subcommittee of the Senate Committee on Interstate and Foreign Commerce on S. 1333, 80th Cong., 1st Sess. 14, 51.

[22] *National Broadcasting Co., Inc.* v. *United States, supra,* at 215–16, 218.

[23] See *In re Petition of Fannie I. Leese et al.,* 5 F. C. C. 364; *Matter of Hearst Radio, Inc.,* 7 F. C. C. 292, 295; *In re Assignment of License of Station WMCA,* 10 F. C. C. 241, 242.

appeal from the Commission's decision, their failure to do so could not destroy their rights under the contract. It could affect them no more than to prevent them from challenging in any court the Commission's decision that a license might be denied Regents for the reasons given by the Commission.[24] We have assumed the correctness of the refusal to grant a license, but we hold that the Commission's order cannot directly affect the validity of the contract. It is a most extraordinary rule that would require respondents to intervene upon pain of suffering a binding judgment which the Commission could not have lawfully imposed upon them had they been actual parties.

*Affirmed.*

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

---

[24] See *Red River Broadcasting Co.* v. *Federal Communications Commission,* 69 App. D. C. 1, 98 F. 2d 282.