**WJIV–TV, Inc., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**WSAV, Inc., Intervenor.**

**No. 12598.**

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 10, 1955.

Decided Jan. 12, 1956.

Mr. Philip M. Baker, Washington, D. C., for appellant.

Mr. Warren E. Baker, Gen. Counsel, Federal Communications Commission,

with whom Messrs. J. Smith Henley, Asst. Gen. Counsel, Federal Communications Commission, and Isadore A. Honig, Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. Marcus Cohn, Washington, D. C., with whom Mr. Stanley S. Neustadt, New York City, was on the brief, for intervenor. Mr. Paul Dobin, Washington, D. C., also entered an appearance for intervenor.

Before BAZELON, FAHY and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

Intervenor, WSAV, Inc., on March 19, 1951 and petitioner, WJIV-TV, Inc., on July 1, 1952, filed applications for a construction permit for television Channel 3 at Savannah, Georgia. After comparative hearing, the Commission found both applicants to be legally, technically and otherwise qualified, that intervenor is financially qualified and that, comparatively, "The public interest, convenience and necessity would best be served by a conditional grant of the application of WSAV, Incorporated, and the consequent denial of the application of WJIV-TV, Inc." Petitioner raises no question concerning the Commission's determination with respect to the comparative merits of the competitors but urges upon us as error: the grant to intervenor upon a condition of non-use of construction begun prematurely in violation of § 319(a) of the Communications Act of 1934[1]; that the Commission acted arbitrarily and capriciously in finding that a certain room built by intervenor was not premature construction; that the Commission, because of the mandatory language of §

319(a) was without power to grant intervenor's application since certain facilities for the operation of a station had been constructed without prior authorization by the Commission; and the Commission's failure to find that intervenor, because of membership in Savannah Radio Council had relinquished its responsibilities as a radio licensee and further had conspired through the Council to restrict competition in violation of the antitrust laws.

So far as the issues turned upon controverted questions of fact, the Commission's decision was within its competence and is supported by substantial evidence of record. It could properly have found within the limits of its own expertise that the room built by intervenor on the roof of the building in which intervenor's radio station was located possessed no "intrinsic television-facility function. So viewed, the interdiction of commencement of construction of a 'station' does not encompass the type of construction involved with respect to the room." So, too, with respect to petitioner's complaint based upon intervenor's membership in the Savannah Radio Council, for the Commission found that a bylaw of the Council, alleged to be restrictive, was later rescinded and thus of negligible significance, and intervenor's earlier participation with other Savannah radio stations in protesting the Commission's action approving an additional radio broadcast station for the Savannah community was within its right, and was not of major concern in any event. We agree.

Actually, the issue in the case comes down to the applicability of § 319(a)[2]

1. 47 U.S.C.A. § 151 et seq.

2. "No license shall be issued under the authority of this Act for the operation of any station the construction of which is begun or is continued after this Act takes effect, unless a permit for its construction has been granted by the Commission. The application for a construction permit shall set forth such facts as the Commission by regulation may prescribe as to * * * the ownership and location of the proposed station and

of the station or stations with which it is proposed to communicate, the frequencies desired to be used, the hours of the day or other periods of time during which it is proposed to operate the station, the purpose for which the station is to be used, the type of transmitting apparatus to be used, the power to be used, the date upon which the station is expected to be completed and in operation, and such other information as the Commission may require. * * * "

and the interpretation which is to control in the light of the facts and the record presented here. Petitioner contends that *any* premature construction precludes a grant and that the statute must be given mandatory effect.

Intervenor became licensee of radio station WSAV in Savannah in 1939. It received an FM license in 1947. In 1951 intervenor occupied the tenth floor in the Liberty National Bank Building in Savannah. Since 1904 there has been located an elevator-penthouse where the building's elevator and machine room are installed. In 1951 when intervenor filed its application, it specified to the Commission its plan to locate its television antenna on the roof of the bank building. It was permitted by the lessor at that time to open up the roof to ascertain whether the building's steel columns came up to the roof of the elevator-penthouse and to establish the thickness, location and load-bearing qualities of these columns. It was then discovered that the building's steel columns, 12½ feet apart, ran to the penthouse roof. Contemporaneously, the owners of the bank building were undertaking remodelling work on the whole building, necessary in order to comply with a state fire law which required enclosure of both the elevator shafts and the stair well of the building from street level to roof. Intervenor and the bank, as owner, determined that both parties would have need for the use of a boom and tackle on top of the building for the lifting of materials to and from the roof. Landlord and lessee thereupon agreed to share the expenses in arranging for the installation of the boom and tackle. The equipment was used by the intervenor to bring to the roof a 10-ton air conditioner for use in its tenth floor AM-FM offices, a WSAV roof sign, a generator, and steel ultimately to be used for the television tower. The same equipment was used by the bank to raise or lower heavy building materials such as metal doors, door frames, concrete blocks, and concrete, a large safe, a 10-ton air conditioner and cooling tower. The boom and tackle had been attached to the elevator-penthouse roof by connections with two steel columns, 25 feet apart. Steel sleeves were welded to these two steel columns, each sleeve extending approximately 6 inches below and approximately 14 inches above the elevator-penthouse roof. While this work was being done for the joint benefit and at the joint expense of the bank and the lessee, intervenor caused a third such steel sleeve to be welded to a penthouse column, 25 feet from the other two sleeves. Intervenor contemplated that the 3 sleeves in due course would be used as the base of its television tower although adaptation for such purpose by further construction would utimately be required. The steel for the tower was delivered in December 1951, and unpainted and unassembled, it is still stored on the roof. Apparently the steel sleeves can readily be removed.

Some time in the spring of 1951, intervenor commenced construction of a room, 19 feet x 35 feet, on the building roof at a point immediately east of the elevator-penthouse, utilizing three walls, already part of the building, including the eastern penthouse wall and part of the parapet of the roof. Certain wiring and equipment were also placed therein for possible use in a training program, not actually undertaken. Nor was provision made for full power necessary to operate a transmitter, the Commission found. There is no clear record as to whether the room was intended for storage, for use in connection with the closed circuit personnel training program, or as a permanent part of the proposed television station. Extensive construction will yet be required, and television equipment, either delivered or under contract for delivery, must be installed. Such as is on hand has never been connected to electric power, in short, there is ample evidence to sustain the Commission's finding that the room possesses no "intrinsic television-facility function."

In these circumstances and in the light of full consideration of the respective claims and of the facts found, the

Commission concluded that WSAV, Incorporated, should receive a "conditional"[3] grant of its application. It then ordered "that the application of WSAV, Incorporated for a new commercial television station in Savannah, Georgia, to operate on Channel 3 IS HEREBY GRANTED subject to the condition that it does not utilize its presently proposed tower base, consisting of three steel sleeves installed on the penthouse-roof of the Liberty National Bank Building in Savannah * * *." (J.A. 303–304)

The condition imposed effects no material change in the proposal of WSAV, Incorporated, to locate its antenna tower on the bank building roof. Thus, we are in accord that the Commission acted within its authority in adopting the order quoted.[4] My colleagues are of the view that we need go no farther and would now affirm the Commission order as a whole, without more.

## II

While I agree so far as the result is involved, speaking for myself, I would prefer to rest our decision on a broader ground. It is true that the intervenor has not contested before us the requirement that it meet what seems to me an absurd burden. It may cut off the offending steel sleeves and install new ones on the same columns. It may reorient the tripod base of its tower on three different columns on the same roof. It has not pressed here its contention before the Commission that there was no "premature" construction, condemned by

§ 319(a) or otherwise. The Commission's brief describes its non-use order with respect to the 1951 construction as "but an application of the settled policy of the Commission" even as it points out: "Section 319(a) contains no requirement that the Commission must refuse a construction permit to an applicant who has begun premature construction." This is so clearly correct that I think we should say so, to the end that the way will be open to sensible future administration of the section without a cloudy obstruction of the Commission's exercise of its proper powers. The section by some has been read without regard to its "unless" clause by which the Commission always has it within its power to pass upon and approve—or disapprove— a proffered construction plan.

Confusion has arisen because some have had recourse to *recommendations* to be found in the legislative history, or to *proposals* in various bills while Congress wrestled with the radio problems of the day.[5] But Congress *rejected* such recommendations. It *refused* to enact *such proposals*. Instead, the Act expressly reposed power in the Commission to consider and evaluate each situation.

Petitioner has failed to recognize a distinction, so clearly set forth in the Act, between a license for the operation of a station[6] and a permit for the construction of one. Petitioner has asked us to construe the first sentence of § 319 (a) as though it reads:

"No permit shall be issued for the *construction* of a station, the con-

---

3. The Commission had previously so conditioned unopposed grants in two cases, Alvin E. O'Konski, 8 Pike & Fischer R.R. 811 (1953); TV-Colorado, Inc., 8 Pike & Fischer R.R. 700 (1952). And see 47 U.S.C.A. § 303(r), which authorizes the Commission to "make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this Act." Cf. Regents of University System of Georgia v. Carroll, 1950, 338 U.S. 586, 600, 70 S.Ct. 370, 94 L.Ed. 363.

4. Woodmen of the World Life Insurance Society v. Federal Communications

Comm., 1939, 70 App.D.C. 196, 105 F. 2d 75, certiorari denied, 1939, 308 U.S. 588, 60 S.Ct. 112, 84 L.Ed. 492.

5. See the highlights reviewed by the Court in National Broadcasting Co. v. United States, 1943, 319 U.S. 190, 210 et seq., 63 S.Ct. 997, 87 L.Ed. 1344.

6. The word "station" means "a station equipped to engage in radio communication or radio transmission of energy." § 153(k). The Act further defines "radio transmission of energy" to include both "such transmission and all instrumentalities, facilities, and services incidental to such transmission." § 153(d).

struction *of any part of which* has been commenced prior to the Commission's favorable action on an application for a permit to construct such a station."

The Act says nothing of the sort. There is no mysterious meaning to be ascribed to the language which was adopted.[7] It contains no hidden twist. Whether construction of a "station" has been begun or continued after the effective date of the Act *or not,* no license to operate *any* "station" shall be issued *"unless a permit for its construction has been granted by the Commission."* The first sentence of § 319(a) applies to *all* station permits except such as may come within § 319 (d). It will be seen that the statute in the first clause employs the negative, "No license shall be issued * * * for the operation of any station * * *," and in the second clause, the conditional negative, "unless a permit for its construction has been granted by the Commission."

We are not unfamiliar with such usage for it constantly confronts us in many fields of the law, as a few random references will make clear. "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. * * *"[8] Obviously, if the conditions introduced by the conjunction "unless" be met, we have an affirmative, not a negative, result. "No temporary restraining order shall be granted without notice to the adverse party unless it clearly appears from specific facts * * * that immediate and irreparable injury * * * will result

* * *."[9] Not only does the language form frequently appear elsewhere in our rules of court, it is commonly to be found in our statutes. A single illustration will suffice.[10] "No bill of sale, mortgage, or deed of trust to secure a debt of any personal chattels whereof the vendor * * * shall remain in possession, shall be valid * * * unless the same be executed, acknowledged, and within ten days from the date of such acknowledgment filed in the office of the recorder of deeds * * *."[11] Clearly, when such an instrument is drawn and filed in compliance with the statutory conditions, it is valid.

Such a construction has long been established, in many fields, in many jurisdictions, and is well known to Congress.

> "When [the statute] says that the officer shall not be bound to keep the property, or to deliver it to the plaintiff, *unless* the plaintiff, on demand, shall indemnify the officer against the claim of the third party, though negative in form it conveys the affirmative meaning, that if the plaintiff does so indemnify, then the officer shall keep the property or deliver it to the plaintiff. * * *
>
> * * * * * *
>
> "The word *unless* has the force of except; its primary meaning is 'unloosened from,' so what follows in the sentence after the word *unless* is excepted or unloosened from what went before it * * *. For such a form of expression in a statute sometimes amounts to an affirmative enactment, and in fact in *proprio vigore,* confers all that is excepted from a negative or restrictive provision."[12]

---

7. See the exact text, supra note 2.

8. Rule 51, Fed.R.Civ.P., 28 U.S.C.A.

9. Rule 65, Fed.R.Civ.P., 28 U.S.C.A.

10. From many enactments, one may select comparable instances of statutory usage of the "double negative." Cf. 29 U.S. C.A. § 159(f), (g) and (h).

11. D.C.Code 1951, § 42–101.

12. Manning, Bowman & Co. v. Keenan, 1878, 73 N.Y. 45, 55–56, 41 N.Y.Supp. 396, 399 Append.; and see Dillon v. General Exchange Insurance Corp., Tex.Civ. App.1933, 60 S.W.2d 331. ("This policy shall not be valid unless countersigned by the duly authorized agent of the Company * * *."); Graham v. Wichita Terminal Elevator Co., 1924, 115 Kan. 143, 222 P. 89, 90 (No claim for attor-

Applying such guides, there need be no problem in understanding § 319(a). The sentence means that when an applicant submits to the Commission a proposal for the erection of a "station" and seeks a construction permit therefor, and outlines its plans, whether for a completely new station or for the adaptation or modification of an existing station, the Commission may consider the application in the light of all the facts and of the engineering detail submitted. If the application be found satisfactory, the Commission may approve the grant of a construction permit. Then if the other conditions of § 319 and of the Act shall have been met, and if the proposed station shall have been constructed in accordance with the construction permit as granted, a station license shall be issued. The command of § 319, as a whole, is clear. The first sentence, simply stated, means that the Commission must approve what is done, or is proposed to be done, and when so approved, a construction permit will be granted.

Let us assume a case. An AM station is licensed to operate in 1939. In 1947 it applies for an FM construction permit, and exhibits its plan to adapt, so far as possible, its present AM broadcast facilities. May not the Commission consider the proposal and if it be found feasible to incorporate the AM facilities, thereupon approve a construction permit for the FM station? When by 1948 the advance of the science had demonstrated the practicability of commercial television, and the Commission, after rule-making, had allocated channels accordingly, might it not approve an application for a TV construction permit which will include use of previously constructed facilities susceptible of conversion or modification to TV uses? Surely in meeting the public interest as to television requirements, the Commission is

not commanded to relegate to the scrapheap thousands of dollars worth of useful equipment and construction which lends itself to the new need. The point is that the plan, taken as a whole, for construction of a new or different station must justify the issuance of a *construction permit for that new use*. If the Commission shall so approve, the construction permit may be granted. Of course, the Commission must make a factual inquiry and satisfy itself, but that is part of its function.

Accordingly, an application for a construction permit will be required to set forth what type of construction is planned, whether it be for the construction of a new station, the modification of construction of a standard broadcast station, an FM broadcast station, or a television broadcast station, or what not, with complete engineering data to be supplied with respect thereto. The application may be required to specify, and the Commission's forms so prescribe, whether the proposed structure will be constructed on the top of a building. The Act does not forbid the conversion of an already existing structure or its adaptation to the needs of a station. The Act does not forbid the assembling of all of the materials and the equipment from which a "station," sooner or later, will be constructed. The Act does not say that a construction permit previously authorized for one type of station may not be modified to provide for another, nor does it forbid use of an existing structure to carry the type of tower which will accommodate a television antenna. Witness the use of the Empire State Building. The Act does not say that an applicant may not make new or added use of any plant or equipment, already owned by the applicant, and which it desires to expand. Were any such mandatory prohibition involved, the holder of a present

ney fees shall constitute an enforceable lien unless stated pursuant to a written contract approved by the court); Ward v. Interstate Business Men's Acc. Ass'n, 1918, 185 Iowa 674, 169 N.W. 451, 452 ("In other words, the language following the word 'unless' is in the nature of a limitation attached to what preceded. * * *"); City of Hickory v. Southern Ry. Co., 1904, 137 N.C. 189, 49 S.E. 202, 204–205; cf. Alexander v. People, 1884, 7 Colo. 155, 2 P. 894, 899.

station permit for one class of broadcast would be precluded from foresighted planning which would permit it to take account of new developments and discoveries in the scientific phases of the broadcast field. Congress purposefully has *never* said that.

The Commission's inquiry may reasonably be expected to canvass the various steps previously taken and the circumstances attendant upon the proposed use of an existing structure, or its conversion to the status of a "station" or to its adaptability for use as one. Several questions suggest themselves. Was the use of the structure previously authorized in connection with the transmission of radio energy, irrespective of the particular presently proposed use? Was such construction as had been "begun," so commenced with the intention of the petitioner's gaining a possible advantage over a competitor? Has the petitioner, because of some prior construction of whatever nature or extent, sought to use that construction to influence the Commission's decision with reference to an application filed, or to be filed, for a construction permit? Does the petitioner in its presently pending application rely upon prior construction as a possible predicate for the grant to it of a construction permit? Answers to such questions will disclose whether an applicant seeks special advantage simply by "jumping the gun" or by applying "pressure."

Petitioner here, certainly, judging from its argument, misread the legislative history. From the debates in Congressional sessions prior to the adoption of the Radio Act of 1927, it becomes perfectly clear that various *rejected* recommendations and proposals for advance approval of *any* construction were related only to a Congressional purpose that the Commission because of prior construction is not to be "pressured" into the grant of a "station" license.[13] But the Commission surely is authorized to consider answers to such questions as are herein suggested in arriving at a determination as to whether or not to grant a construction permit.

It is clear that the Commission's powers reasonably may be exercised to effectuate the purposes of the Act. In its informed judgment, the Commission must draw the line somewhere, but that is its duty.[14] Having in mind what Congress sought to accomplish, we will not be "led

13. In this very case, the Commission considered the legislative history of the Communications Act, as will be seen from its extensive references.

"Unauthorized prior construction does, therefore, not disqualify WSAV as an applicant herein. Without attempting a detailed account thereof, the Congressional intent and objective underlying the 1922–27 legislation preceding the enactment of the Federal Radio Act of 1927 which, in turn, preceded the presently controlling Communications act of 1934, as amended, was to discourage applicants from making large investments and using such investments as 'improper pressure' on the licensing authority. * * * At the time this requirement for securing of a construction permit (antecedent to obtaining a license to operate) was urged in Congress, the following situation prevailed: in view of the then existing state of the radio art, construction of a station to the extent it involved installation of radio equipment was dependent upon the 'wave length' a station was to use; the necessity of securing a permit prior to such construction was thus intended to reduce pressure on the licensing authority in that the latter's decision to establish zones of wave lengths was not to be influenced by the *fait accompli* of prior construction of considerable proportion. Expenditures are therefore related to construction of facilities the principal value of which lies in their use for proposed broadcast purposes." (J.A. 287–88)

See 10 Pike & Fischer Radio Reg. 402, 430j (1954); and compare H.R.Rep. No. 417 to accompany H.R. 4557, P.L. 321, 83d Cong., 1st Sess. (1953), 68 Stat. 35 (1954), 47 U.S.C.A. § 319(d).

14. "That is the question in pretty much everything worth arguing in the law. Hudson County Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 52 L. Ed. 828. Day and night, youth and age are only types", said Mr. Justice Holmes in Irwin v. Gavit, 1925, 268 U.S. 161, 168, 45 S.Ct. 475, 476, 69 L.Ed. 897.

to absurd or futile results," [15] even if the literal words could be read to mean what petitioner here had argued.

Thinking thus, I would have said that the Commission might properly have imposed no condition of non-use with respect to the steel sleeves as part of the proposed construction for which a construction permit was granted. As it is, I certainly will not say the Commission's order is unreasonable even if the result be not commanded by the statute. At any rate, we agree upon affirmance.

BAZELON and FAHY, Circuit Judges (concurring in affirmance).

Our affirmance rests on the Commission's construction of the statute. We think the different construction preferred by Judge DANAHER is inconsistent with the legislative history of the statute. As the Commission states in its brief in this case, after an extended review of the legislative history,

██ "Despite a seeming lack of specific Congressional consideration of premature construction of either the limited extent or precise nature of that engaged in by WSAV, it is clear that Congress did intend both that station construction erected prior to issuance of a permit therefor should not be licensed for operation and that premature construction should not absolutely disqualify an applicant. The Commission's grant to WSAV, by prohibiting use of the steel stubs which were erected without a permit, fully effectuates that congressional intent.

"Since the Commission's uniform interpretation of Section 319(a) is consistent with both the language and the legislative purpose thereof, it is entitled to 'great weight,' and its decision ought to be affirmed. *Union Manufacturing Company* v. *National Labor Relations Board,* [95] U.S.App.D.C. [252], 221 F.2d 532, 536, cert. denied [349 U.S. 921]

75 S.Ct. 660 [99 L.Ed. 1253]. See also *United States et al.* v. *American Trucking Associations, Inc., et al.,* 310 U.S. 534, 549 [60 S.Ct. 1059, 84 L.Ed. 1345]; *District of Columbia* v. *Young Men's Christian Association,* [95] U.S.App.D.C. [179], 221 F.2d 56, 59."

---

15. United States v. American Trucking Ass'ns, 1940, 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345.