In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2999

Curtis P. Jahn and Capitol Warehousing
Corporation,

Plaintiffs-Appellants,

v.

1-800-FLOWERS.com, Inc., Fresh Intellectual
Properties, Inc., and 800-FLOWERS, Inc.,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 00-C-446-C--Barbara B. Crabb, Chief Judge.

Argued January 17, 2002--Decided March 29, 2002


   Before Flaum, Chief Judge, and Bauer and
Easterbrook, Circuit Judges.

   Easterbrook, Circuit Judge.  When Madison
Truck Brokers subscribed to an incoming-
toll-free number in 1976, at&t assigned it
800 356-9377 at random. Madison Truck
Brokers and its successor Capitol
Warehousing Corporation used the number
in their transportation business until
1982, when they expanded into floral
delivery. William Alexander thought that
800-FLOWERS would be the ideal toll-free
number for a florist--and someone typing
that sequence on a phone's keypad will
reach 800 356-9377.

   Alexander approached Curtis Jahn, the
owner of Capitol Warehousing, with a
proposal to test-market floral sales via
the 800-FLOWERS number. Jahn and
investors recruited by Alexander
organized 800-Flowers, Inc., a Wisconsin
corporation, to explore the idea and, if
events justified, to run a national
flowers-by-phone business. Advertisements
in New Orleans produced enough calls to
encourage further exploration. (The
record does not reveal how the venture
separated the flower-related calls from
truck-related calls, for every call to
that number reached Capitol Warehousing's
office.) After an infusion of additional

capital and resolution of litigation brought by another corporation that claimed trademark rights to "800-FLOWERS" (though the rival lacked the phone number to go with the idea), the business was launched nationwide. At Jahn's request, at&t transferred the phone number to 800-Flowers (Wisconsin), which became the subscriber and paid all bills. In a move that he may now regret, Jahn took not only an equity stake in the new corporation but also a royalty interest in revenues derived from phone sales. Corporate reorganizations transferred the firm's assets to 800-Flowers (Texas) and later 800-Flowers (New York), which is among the defendants. Jahn gave up his equity interest but retained his royalty (as restated by an agreement with 800-Flowers (Texas) in 1986, an agreement that contains a Texas choice-of-law clause).

In this suit under the diversity jurisdiction, Jahn accuses 800-Flowers (New York) and its parent corporation 1-800-Flowers.com, Inc.--a corporate name mixing Internet with phone symbols, packet-switched with circuit-switchednetworks--of failing to pay his full royalty under the 1986 agreement. Defendants responded that payment is illegal under a regulation forbidding the sale of phone numbers-- and for good measure they added the inconsistent defense that they have paid Jahn every penny that the agreement requires. The district court concluded that the royalty interest reflects at least in part the value of the 800-FLOWERS number and constitutes a sale proscribed by the 1997 regulation, 47 C.F.R. sec.52.107(a), even though a stock interest of equivalent economic value would be lawful today. This aspect of the district court's ruling has not been contested on appeal. Next the district court concluded that it is unnecessary to decide whether the 1997 regulation may be applied retroactively. The ongoing payment is itself illegal, the judge held, and defendants are excused from further payment because Texas law treats illegality as a form of impossibility that constitutes a defense to non-performance. See Centex Corp. v. Dalton, 840 S.W.2d 952 (Tex. 1992).

Given the district court's uncontested finding that Jahn's royalty interest represents the sale of a telephone

number, we may assume that the 1982 and 1986 transactions would violate federal law if implemented today. The governing regulation provides:

(a)  As used in this section, hoarding is the acquisition by a toll free subscriber from a Responsible Organization of more toll free numbers than the toll free subscriber intends to use for the provision of toll free service. The definition of hoarding also includes number brokering, which is the selling of a toll free number by a private entity for a fee.

(1) Toll free subscribers shall not hoard toll free numbers.

(2) No person or entity shall acquire a toll free number for the purpose of selling the toll free number to another entity or to a person for a fee.

(3) Routing multiple toll free numbers to a single toll free subscriber will create a rebuttable presumption that the toll free subscriber is hoarding or brokering toll free numbers.

(b)  The following provision shall be included in the Service Management System tariff and in the local exchange carriers' toll free database access tariffs:

[T]he Federal Communications Commission ("fcc") has concluded that hoarding, defined as the acquisition of more toll free numbers than one intends to use for the provision of toll free service, as well as the sale of a toll free number by a private entity for a fee, is contrary to the public interest in the conservation of the scarce toll free number resource and contrary to the fcc's responsibility to promote the orderly use and allocation of toll free numbers.

47 C.F.R. sec.52.107. Number "hoarding" is proscribed, and subsection (a) defines "hoarding" to include "number brokering", which includes "the selling of a toll free number by a private entity for a fee." As an independent matter it would be difficult to conceive of Capitol Warehousing's corporate mitosis, and the allocation of its toll-free number to one of the offspring, as an episode of either "number hoarding" or "number brokering",

whether or not the original corporation's owner was paid for his assistance in the transaction. Capitol Warehousing did not tie up "more toll free numbers than the toll free subscriber intends to use for the provision of toll free service" or "acquire a toll free number for the purpose of selling the toll free number" (emphasis added).

The Federal Communications Commission has not made it clear whether every transfer for value is a form of "number brokering" even when the transfer does not entail any of the events listed in subsections (a)(1) through (a)(3); the regulation does not contain the word "all" and thus its scope is open to question. To say "A includes B" is not necessarily to say "all B is A." Many firms transfer their phone numbers to their successors (or to ventures spun off into subsidiaries) in order to preserve the good will and custom of the business. The regulation shows that phone numbers cannot be treated like Internet domain addresses, which regularly are sold outright for a fee, but it does not show that all transfers to new ventures are forbidden; it would not make much sense to have numbers with economic value (such as 800-FLOWERS) perpetually assigned to businesses (such as transportation brokers) that cannot realize this value. Moving assets to higher and better uses is an important goal of any economic system. Drawing a line between these normal and lawful transactions and forbidden "hoarding" or "number brokering" would be a job for the fcc, not for the courts, at least as an initial matter. But we need not send this issue to the Commission under the doctrine of primary jurisdiction, because it is possible to resolve this case on the assumption that all sales are "number brokering".

The district court bypassed the question whether sec.52.107 proscribes sales that occurred before its adoption. For reasons explained presently, the answer matters-- and it is a simple "no." Federal regulations do not, indeed cannot, apply retroactively unless Congress has authorized that step explicitly. See Bowen v. Georgetown University Hospital, 488 U.S. 204 (1988). No statute authorizes the fcc to adopt regulations with retroactive effect, and sec.52.107

does not purport to affect transactions entered into before 1997. Defendants say that sec.52.107 just restates prior law, but this position is untenable. Relevant prior law, from the phone companies' tariffs, was that subscribers do not own telephone numbers assigned to them. This meant that the carriers could change numbers without liability to the subscribers. It did not mean that subscribers were forbidden to transact about whatever interests they enjoyed in the use of numbers currently assigned. Consider Internet domain names. These are rented by the year from administrators (one per top domain), yet there is a thriving market in these addresses. This is true of other leaseholds: a lessee does not own the premises but may transfer his possessory interest for whatever price the traffic will bear, unless the lease forbids assignments and subleases. A football team does not own its players but may trade their contracts. And, as University of Georgia v. Carroll, 338 U.S. 586 (1950), holds, broadcast licenses may be sold despite the mantra that the airwaves are a public resource. If broadcast licenses may be sold even though they are not "property" of the licensees, then telephone numbers could be sold until 1997 even though they, too, are not the subscribers' property. Jahn could not have compelled at&t to transfer the number to 800-Flowers (Wisconsin), but it proved willing to do so, and no rule of federal law in force at the time prevented the firm from compensating Jahn for his assistance in securing this transfer.

Thus we arrive at the question whether deferred payment for a lawful (because pre-1997) sale violates sec.52.107--for, if it does, then Texas law gives 800-Flowers (New York) a defense. Yet nothing in sec.52.107 speaks to payment; the regulation concerns future sales, not compensation for older and thus lawful sales. That's what it means to say that the regulation is not retroactive. All "retroactivity" could mean for these parties would be a prohibition against future payments. (Surely defendants do not think that the regulation compels at&t to restore 800 356-9377 to Capitol Warehousing, the original subscriber!) Changing today's financial consequences of an earlier transaction is the paradigm of retroactivity. See Landgraf v. USI

Film Products, 511 U.S. 244 (1994). When Congress compelled mine operators to pay black lung benefits to miners who retired before the law's enactment, the Supreme Court treated this as classically retroactive legislation. See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1 (1976). It did not say, as defendants here do, that a law is prospective when it rearranges wealth for the future; a wealth transfer that depends on events preceding the rule's adoption has a retroactive effect. Defendants insist that sec.52.107 transfers wealth from Jahn to themselves, on account of events that occurred in 1982 and 1986. That would be an instance of retroactivity; and as sec.52.107 is not retroactive, it also does not affect the royalty. (Nor does any other rule of federal law do so. Defendants err in supposing that there is a rule against perpetual royalties. See Aronson v. Quick Point Pencil Co., 440 U.S. 257 (1979).)

A royalty is a risk-sharing agreement. Instead of paying Jahn up front the estimated value of the phone number, the investors who established 800-Flowers (Wisconsin) and its successors divided the risk with Jahn, so that he would be paid only to the extent the new business succeeded. Suppose they had done things otherwise--paying Jahn a lump sum and dividing the risk among investors who financed that payment. Any attempt to force Jahn to disgorge what he received in 1982 or 1986 would be retroactive. Yet this is no different, as an economic matter, from refusing to make ongoing payments. Suppose that Jahn had manufactured his own lump-sum payment by borrowing against the value of the royalty. A bank could have lent Jahn $1 million (say) in 1986, taking the royalty agreement as security for repayment. The effect on such a lender of losing its security because of a 1997 regulation would be visibly retroactive. So too if 800-Flowers (Wisconsin) had paid Jahn $1 million cash, borrowing the money from bondholders who were promised repayment out of the phone number's future value. Defendants could not have used the 1997 regulation as a reason to stop repaying their bondholders. Or consider yet another example: suppose that Texas were to vote to go dry on January 1, 2003, and ban all imports of liquor, as sec.2 of the twenty-first amendment permits. During December 2002 a vintner delivers

1,000 cases of its best cabernet sauvignon to a merchant in Texas, on credit. January 1 arrives; no new sales could be made; would the buyer be free to ignore the debt for the wine already received? Surely Texas would not permit such a step, which would differ but little from theft. If the buyer of wine must pay even after new sales have been forbidden, then the buyer of a phone number must pay too.

Defendants have other arguments that the district court did not consider. We leave these to be sorted out on remand.

Reversed and Remanded

Flaum, Chief Judge, concurring. I join the panel's opinion and only comment separately to underscore what I understand to be the holding of this case. The circumstances presented in this appeal are unique (a toll-free telephone number was effectively sold, in exchange for the payment of royalties, prior to the time when such transfers became illegal). I do not consider our decision today to authorize the sale, brokering or hoarding of toll-free numbers, as the FCC has clearly spoken on this issue.