GARDNER *v.* REED et al.

In Banc. Oct. 10, 1949.

No. 37166 (42 So. (2d) 206)

Forrest G. Cooper, for appellant.

308

Montgomery & Varnado, and **Harold Cox**, for appellees.

**McGehee, C. J.**

This is a suit for damages on account of the breach of a contract on the part of the defendants, Maurice T. Reed and others, doing business as the M. T. Reed Construction Company, for the purchase from the plaintiff, A. H. Gardner, of the 200 tons of sulphate of ammonia, a commercial fertilizer produced as a by-product of the steel mills of the United States, and bought for use in the farming operations of the defendants in Humphreys County, at the price of $82.75 per ton delivered, as per an agreement of sale entered into in writing between the seller and purchaser on April 4, 1947. The plaintiff found it necessary to resell the 200 tons of fertilizer at the best price obtainable, which resulted in a loss of profits to him of $1,750 thereon. There was a peremptory instruction in favor of the defendants at the close of the evidence, and hence this appeal was taken.

The defendants deny liability on two grounds, First, that there was no breach of the contract by them; and, Second that the plaintiff failed to comply with the requirements of Chapter IV of the Mississippi Code of 1942 as a seller of commercial fertilizer, and particularly the requirement for registration as a dealer therein, the purchase of stamps, the payment of inspection fees, and the

giving of notice to the Commissioner of Agriculture of the shipments.

On the first ground of defense, the proof discloses that the plaintiff purchased the 200 tons of fertilizer during the month of March from Kinchen O'Keefe & Company of Clarksdale, Mississippi, at $66 per ton, with the freight to be paid by the plaintiff from the point of origin at the steel mills to the point of destination, amounting to $7 per ton; that as such purchaser the plaintiff had contracted with his subsequent vendee, M. T. Reed Construction Company, that he would pay the freight on the shipments and sell the fertilizer to the latter at the said price of $82.75 per ton, as contracted for.

The contract provided for the shipment of 100 tons of the fertilizer to the defendants during the month of May 1947, and 100 tons during the first ten days of June 1947. But, on April 28, 1947, the defendants wrote to the plaintiff the following letter: "In regard to the 200 tons of fertilizer that we bought from you, which would be shipped sometime in May and June, this is your authority to please cancel this order as we find we are unable to use same." On the next day, the plaintiff replied and declined to accept the attempted rescission of the contract and notified the defendants that he would hold them responsible for damages on account of their breach thereof. The testimony on behalf of the defendants disclosed that in the meantime they had purchased an Anhydrous product instead for their use and at a considerable saving in cost, and on the alleged ground that the plaintiff had failed to keep the defendants advised as to just when they could expect shipment of the 200 tons of the by-product, sulphate ammonia, purchased from him.

The written contract did not provide that the plaintiff should keep the defendants so advised, and at any rate the defendants had notified the plaintiff by their said letter of April 28th that they did not intend to carry out the contract, which was prior to the time provided for either shipment to be made.

The defendants cite announcements by the text writers and court decisions to the effect that a refusal of a purchaser to perform a contract of sale "must be distinct, unequivocal and absolute." We are of the opinion that the defendants' letter hereinbefore quoted amounted to such a refusal to perform, and especially where the seller acted upon such refusal and promptly advised the purchaser that he was so doing.

But, it is urged that the plaintiff did not ever tender the fertilizer to the defendants so as to put them in default on their contract of purchase. However, this Court has repeatedly held that where it is clear that a tender will not be accepted, it need not be made. Byers v. McDonald, 99 Miss. 42, 54 So. 664; Sovereign Camp, W. O. W., v. McClure, 176 Miss. 536, 168 So. 611, 170 So. 293. And, this rule is likewise announced in 52 Am.Jur. 216, second paragraph of Section 4; and in 17 C.J.S., Contracts, § 481, p. 986. Moreover, if the seller had tendered this fertilizer to the railroad company at the point of origin for shipment to Humphreys County where it was to be delivered, the railroad would not have been in position to have rejected the shipment, and the plaintiff would have uselessly incurred an expense in that behalf, and with the result that he would have increased instead of diminished his damage. Then, too, he was under no obligation to make the tender at a price less than that contracted for by the defendants, and it is evident that the tender would have been refused, since the purchaser had notified the seller that it could not use the fertilizer.

On the second ground of defense, the provisions of the code chapter hereinbefore mentioned make it a misdemeanor for a seller of fertilizer to sell, or offer to sell, the same without compliance with the various statutory provisions. It does not provide for a forfeiture of the purchase price by the seller in the event of noncompliance. If we should read such a provision into the statute, it would render the same highly penal. For instance, if

the failure to comply by the seller would prevent his recovery of the purchase price, then in the instant case the defendants could have received the fertilizer, used it, and declined to pay for the same. If the Legislature had intended to impose a penalty so drastic, it should have been declared so by statutory enactment.

There accompanied the shipments, when later made to the third parties, the proper analysis showing that the shipments were what they purported to be. In fact, this by-product was a standard type of fertilizer, and the purchaser did not discover the failure to comply with each of the several statutory requirements until after the suit was filed for damages on account of the breach of the contract. ██ Moreover, the purchaser is not in a position to set up as a defense the failure of the seller to comply with these statutory provisions, since the seller was not required to comply therewith prior to April 28, 1947, when the agreement for the purchase was cancelled by the defendants.

██ The contract covered the purchase of a lawful commodity, and was not malum in se but merely malum prohibitum. Cf. Levinson v. Cox, 127 Miss. 250, 90 So. 1; Hartford Fire Insurance Company v. Knight, 146 Miss. 862, 111 So. 748; and Huddleston v. McMillan Brothers, 112 Miss. 168, 72 So. 892.

It is true that in the cases above mentioned the statutes involved were for the protection of the public revenue, whereas the statutes here involved are both for the raising of revenue to defray the expenses of the Department of Agriculture in connection with such shipments as well as for the protection of the farmers in their purchase of mixed fertilizers; but since the contract here involved was to cover the sale of a commodity, the sale of which is not prohibited by law, and there is no statutory provision declaring such a contract to be void and unenforceable for failure to comply with the provisions thereof, but makes such failure a criminal offense instead,

██ █ we are aligning ourselves with the decisions of other jurisdictions which hold that in the absence of a statutory provision declaring a forfeiture, none will be imposed. We follow the case of Niemeyer v. Wright, 75 Va. 239, 40 Am. Rep. 720, and other similar holdings, although there are cases in some jurisdictions holding to the contrary.

██ █ Since the amount of the damages is clearly shown by the undisputed evidence, we are of the opinion that the plaintiff would have been entitled to have a peremptory instruction granted in his favor if one had not first been granted to defendants; and the plaintiff having died pending this appeal, and the cause having been revived in the name of the administratrix (Nell G. Allen) of his estate, a judgment will be rendered here accordingly in favor of the appellant in the sum of $1,750 and all costs.

Reversed and judgment here for the appellant.