Powelson *v.* National Airlines, Inc.

April 5, 1954

No. 39154 59 Adv. S. 38 71 So. 2d 467

596

*John M. Gardner, Mize, Thompson & Mize,* Gulfport, for appellant.

*Morse & Morse,* Gulfport; *Jones, Walker & Waechter,* New Orleans, Louisiana, for appellee.

ETHRIDGE, J.

Appellant, Dennis Powelson, brought this action in the Circuit Court of Harrison County against appellee, National Airlines, Inc., to recover damages for an alleged breach of contract for the purchase by appellee of shares of stock owned by appellant in Caribbean-Atlantic Airlines, Inc. In 1945 Powelson was the majority stockholder in and president of Caribbean-Atlantic Airlines, Inc., hereafter referred to as Caribbean. G. T. Baker was president and chairman of the board of directors of National Airlines, Inc., hereafter called National, and also its controlling stockholder. Caribbean was a small, short-haul carrier of persons, property and mail in Puerto Rico and the Virgin Islands. Powelson, the founder of Caribbean, owned 21,000, or 50.4 per cent, of the total of 41,700 shares of outstanding Caribbean stock. National is a major domestic air-carrier of persons, property and mail between many of the principal cities east of the Mississippi River, including Miami and New York.

Several days prior to April 10, 1945, Powelson and Baker met in Miami, Florida, and held a number of conferences concerning a proposed sale by Powelson to National of Powelson's controlling stock interest in Caribbean. It is not clear who initiated this proposal, but it is manifest that both Powelson and Baker were interested in consummating it. After two or three days of negotiation between them, and on April 10, 1945, a con-

tract was executed in the form of a letter to Powelson from National, acting through Baker, and accepted by Powelson. That agreement provided as follows:

"April 10, 1945

Mr. Dennis Powelson
Miami, Florida

Dear Mr. Powelson:

"We propose to offer to the minority stockholders of Caribbean Atlantic Airlines, Inc. one share of the capital stock of National Airlines, Inc. for each five shares of capital stock of Caribbean Atlantic Airlines, Inc. held by them, or a total of 4,140 shares of National Airlines stock for a total of 20,700 shares of Caribbean Atlantic stock. For your controlling interest of 21,000 shares of Caribbean stock we propose to issue 16,710 shares of National stock.

"This offer is conditioned upon our acquisition on or before May 15, 1945, of sufficient minority stock so that together with your holdings of 21,000 shares, we will hold not less than eighty per cent of the presently outstanding stock of Caribbean, there being presently outstanding 41,700 shares of such stock, and that no additional shares of stock will be issued by Caribbean between this date and the date the transaction is consummated.

"If this is satisfactory, please note your acceptance on the bottom of this letter and such acceptance will constitute an agreement on your part to deliver, properly endorsed, to National Airlines, Inc., Jacksonville, Florida, on or before May 15, 1945, all of your 21,000 shares of stock of Caribbean Atlantic Airlines, Inc. in exchange for 16,710 shares of stock of National Airlines, Inc. Which stock we agree to issue and deliver to you subject to the conditions above outlined.

Yours very truly,
NATIONAL AIRLINES, INC.
s/ G. T. Baker, President

ACCEPTED THIS 10TH DAY OF APRIL, 1945.
s/ Dennis Powelson.''

Baker testified that they drew up this agreement together in a hotel room in Miami, and that he had discussed the matter with Powelson several times in the past few years. He said that when he and Powelson talked the deal over, they did not have any attorneys with them, but that they had read the Civil Aeronautics Act, and it was their understanding that it would be all right to go through with the exchange of stock and consummate the deal, and then to submit it to the Civil Aeronautics Board, called the CAB. If the Board disapproved it, he and Powelson understood that National could thereafter divest itself of the Caribbean stock. In other words, National's agreement with Powelson was to go ahead with the transfer of the stock, and if later the CAB disapproved it, National could divest itself of those shares. The understanding was that neither party could withdraw from the contract without the consent of the other. It was Baker's intention to issue the National stock as soon as Powelson turned over to National the Caribbean stock. Baker recognized that Powelson had fully performed his part of the contract when on May 15, 1945, Powelson transmitted to National his Caribbean shares, endorsed in blank. He regarded the contract as entirely performed by Powelson, and completely performed by National except for the delivery to Powelson of the National stock. After the receipt of Caribbean shares by National, its attorneys advised appellee to hold up the delivery of the National shares to appellant until the stock transfer contract was approved by the CAB. The only reason National did not deliver the shares to Powelson immediately was that appellee feared that the CAB might hold the transfer to be in violation of the Civil Aeronautics Act.

Appellant Powelson testified that before he and appellee made the contract of April 10 they had a lengthy

discussion concerning the filing of an application for approval with the CAB. Powelson advised Baker that he did not want to make the agreement contingent upon subsequent possible unfavorable action by the CAB. He did not want the agreement to be dependent upon later CAB approval. He and Baker agreed that the contract would not be submitted to the CAB for approval before the transaction was consummated. But they did agree that all steps necessary for issuing the stock, including a listing by the Securities and Exchange Commission, and approval by the CAB, would be taken without delay. Powelson said that Baker fully agreed that performance of the contract would not be conditioned on the CAB's action, and that the contract would be a completed transaction when it was executed. He remembered that Baker brought up several times the possibility that if the CAB disapproved the acquisition, it could order appellee to divest itself of control of Caribbean, and that Baker understood that risk. Baker was willing to take it and to assume an unequivocal obligation under the contract. After the date of the contract, April 10, 1945, Powelson continued to serve as president of Caribbean, but at all times he acted at the direction and under the control of National.

On April 27, 1945, National and Caribbean made a contract by which National agreed to lease to Caribbean certain aircraft, to furnish personnel for operation of this equipment, and to perform numerous other services for Caribbean. Thereafter National in effect controlled and operated Caribbean as a subsidiary corporation. However, National never did convey to Powelson the National shares as agreed in the contract of April 10, and did not register the Caribbean shares in its own name on the stockbooks of Caribbean.

In May, 1945, National filed an application with the CAB, seeking approval of its proposed acquisition of control of Caribbean, under the contract of April 10,

1945, and the leasing agreement of April 27. This was consolidated with other proceedings concerning this contract. Powelson individually was allowed to intervene. Hence both appellant and appellee were parties before the Board. After a lengthy hearing, the CAB found on March 1, 1946, that National had acquired control of Caribbean in violation of the Civil Aeronautics Act of 1938 as amended; that both parties knew that approval of the transaction by the Board was required as a condition precedent to its validity; that they purposely did not condition performance of the acquisition agreement upon obtaining such approval; and that they were willing to proceed with the stock transfer contract in violation of the statute. The Board found that Section 488 of the Act expressly required prior approval of the Board in order for the acquisition contract to be valid. It disapproved the contract as being not in the public interest, because of the lack of integration of the carriers and the disproportionate purchase price involved. So the Board's order directed National to cease and desist from violation of the statute, to divest itself of all control of Caribbean, to return to the Caribbean stockholders all shares of stock deposited by them with National, and to refrain from issuing its stock in performance of the contract of April 10 for the exchange of stock. The order denied approval for acquisition of control of Caribbean by National, and directed National within 60 days to file with the Board a report showing that it had complied with the terms of the order. Apparently no judicial appeal was taken from that order.

Powelson brought the present suit against National in July 1949. He charged that he had completely performed the contract of April 10, 1945; that National had failed to comply with the agreement; and that plaintiff had delivered the Caribbean shares to the defendant. The plaintiff sought damages for breach of the stock purchase contract in the amount of $413,733. Defendant admitted

the deposit with it by plaintiff of the Caribbean shares. It pleaded that the contract was in violation of Section 488(a) of the Civil Aeronautics Act of 1938 as amended, and it was therefore void and unenforceable; and that refusal of the CAB to approve the contract rendered it impossible of performance, and thereby excused defendant. Defendant also pleaded that upon plaintiff's request defendant had delivered to third persons the Caribbean shares, and that the contract was mutually rescinded by the parties; that the plaintiff and the defendant knowingly and unlawfully entered into the contract in violation of the Civil Aeronautics Act. The circuit court had a preliminary hearing on the affirmative defense of illegality of the contract as a bar to plaintiff's right of recovery. At this hearing in April 1953 no oral evidence was taken. There was introduced into the record the opinion and order of the CAB, and the testimony of Baker and Powelson in the above mentioned hearing before the CAB. The preceding summary of the facts is based upon this evidence. On April 29, 1953, the court entered a judgment dismissing the suit with prejudice, and holding in effect that the defense of illegality of the contract was a valid plea in bar.

 We think that the trial court was correct in this conclusion. The Civil Aeronautics Act of 1938, as amended, in 49 U. S. C. A., Sec. 488, provides as follows: " (a) It shall be unlawful, unless approved by order of the Board as provided in this section— . . . (5) For any air carrier or person controlling an air carrier, any other common carrier, or any person engaged in any other phase of aeronautics, to acquire control of any air carrier in any manner whatsoever; . . . (7) For any person to continue to maintain any relationship established in violation of any of the foregoing subdivisions of this subsection.

"(b) Any person seeking approval of a consolidation, merger, purchase, lease, operating contract, or acquisi-

tion of control, specified in subsection (a) of this section, shall present an application to the Board, and thereupon the Board shall notify the persons involved in the consolidation, merger, purchase, lease, operating contract, or acquisition of control, and other persons known to have a substantial interest in the proceeding, of the time and place of a public hearing. Unless, after such hearing, the Board finds that the consolidation, merger, purchase, lease, operating contract, or acquisition of control will not be consistent with the public interest or that the conditions of this section will not be fulfilled, it shall by order, approve such consolidation, merger, purchase, lease, operating contract, or acquisition of control, upon such terms and conditions as it shall find to be just and reasonable and with such modifications as it may prescribe: Provided, That the Board shall not approve any consideration, merger, purchase, lease, operating contract, or acquisition of control which would result in creating a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier not a party to the consolidation, merger, purchase, lease, operating contract, or acquisition of control: . . ."

Section 401 of this Act defines an "air carrier" as meaning "any citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation . . ." Section 402 is a declaration of congressional policy which states that the CAB in exercising its powers shall consider as being in the public interest the fostering of sound economic conditions in air transportation, and competition to the extent necessary to insure the sound development of an air transportation system. Section 622 states that any person who knowingly and willfully violates these statutes or any order or rule of the CAB shall be guilty of a misdemeanor.

It will be noted that Section 488 expressly provides that it shall be "unlawful" for any air carrier to acquire

control of another air carrier ''in any manner whatsoever,'' unless approved by order of the Board. The statute further requires an application to the Board for approval, and establishes a procedure for the hearing of such application. The Congress manifestly had in mind the prohibition of interlocking ownerships of air carriers, as well as interlocking directors, (Section 489), and the desirability of promoting sound economic conditions in the air transportation industry and competition commensurate with that objective (Section 402). Pursuant to the Congressional declaration of policy, Section 488 states that contracts for acquisition of control of one air carrier by another are ''unlawful,'' unless approved by the Board. Both Powelson and Baker testified that they willfully and knowingly made the contract of April 10, 1945, and agreed that it would be effective and binding on Powelson and National irrespective of any action of the Board. This is undisputed on this record, and the CAB expressly so found in the hearing before it in 1946, to which both appellant and appellee were parties. Hence the parties concede in effect that they made a contract which the statutes declare to be unlawful and a misdemeanor.

 The general rule applicable to such an illegal bargain is stated in 2 A. L. I., Restatement of Contracts, Section 598: ''A party to an illegal bargain can neither recover damages for breach thereof nor, by rescinding the bargain, recover the performance that he has rendered thereunder or its value, . . .'' This rule is not based on the impropriety of compelling the defendant to pay damages, although that in itself would generally be a desirable thing. When relief is denied, it is because the plaintiff is a wrongdoer, and to such a person the law denies relief. Courts do not wish to aid a man who founds his cause of action upon his own admitted illegal act. To deny such persons recovery tends to diminish the number of illegal agreements, and is in accord with the mani-

fest legislative policy. See also Restatement of Contracts, Section 580. No action can be based on an illegal agreement. The foundation of this rule is in the policy of discouraging illegal agreements by refusing all judicial aid to the parties to them. And it applies to any agreement which is prohibited by statute. 12 Am. Jur., Contracts, Sections 209-214; 17 C. J. S., Contracts, Sections 189, 191, 201, 202. This contract was made in Florida, and the substantive law of that state, subject to the federal statute, would apply. Florida follows these principles. Local No. 234 v. Henley & Beckwith, Inc., 66 So. 2d 818 (Fla. 1953). Gardner v. Reed, 207 Miss. 306, 42 So. 2d 206 (1949), is not applicable, because this is a Florida contract and because there it was held that no statutory provision declared the contract in question to be void and unenforceable. Moreover, the defendants had attempted to cancel that agreement prior to the date the seller of the fertilizer was required to comply with the statute in question.

 Under the supremacy clause of the United States Constitution, Article VI, Clause 2, the rule which would be applied by the federal courts to Section 488 of the Civil Aeronautics Act controls. We think that Kaiser-Frazer Corporation v. Otis & Company, 195 Fed. 2d 838 (C. A. 2d 1952), certiorari denied, 344 U. S. 856, 73 S. Ct. 89, 97 L. Ed. 664, is pertinent. Plaintiff sued Otis and Company to recover damages for breach of a contract by which defendant was to purchase stock from plaintiff. Under the contract the registration statement and the prospectus filed with the Securities and Exchange Commission by plaintiff was required to comply with the Securities Act of 1933. The prospectus contained grossly misleading terms concerning the plaintiff's earnings for December 1947, and to that extent violated the statute requiring truthful statements of material facts in a prospectus, and making a violation of these requirements a misdemeanor. In denying the plaintiff damages for de-

fendant's failure to purchase the shares under the stock purchase contract, the Court said: ''But whatever the rules of estoppel or waiver may be in the case of an ordinary contract of sale, nevertheless it is clear that a contract which violates the laws of the United States and contravenes the public policy as expressed in those laws is unenforceable. E. E. Taenzer & Co. v. Chicago, R. I. & Pa. Ry., 6 Cir., 191 F. 543, certiorari denied, 223 U. S. 746, 32 S. Ct. 533, 56 L. Ed. 640; cf. Sola Electric Co. v. Jefferson, 317 U. S. 173, 63 S. Ct. 172, 87 L. Ed. 165. This is so regardless of the equities as between the parties for ' * * * the very meaning of public policy is the interest of others than the parties and that interest is not to be at the mercy of the defendant alone.' Beasley v. Texas & Pacific Ry., 191 U. S. 492, 498, 24 S. Ct. 164, 48 L. Ed. 274. Any sale to the public by means of the prospectus involved here would have been a violation of the Securities Act of 1933, 15 U. S. C. A., Sec. 77 1(2). While it may be argued that the enforcement of the underwriting contract according to its terms would result only in the sale of the stock to Otis and that such a sale would not violate the Act, see 15 U. S. C. A., Sec. 77d(1), we are satisfied that the contract was so closely related to the performance of acts forbidden by law as to be itself illegal.''

The cases relied upon by appellant are not controlling. Cole v. Brown-Hurley Hdw. Co., 139 Iowa 487, 117 N. W. 746 (1908), and Steele v. Drummond, 275 U. S. 199, 48 S. Ct. 53, 72 L. Ed. 238 (1927), involved contracts which were not expressly made unlawful by statute, as is the instant agreement, and the courts there refused to imply an illegal or immoral purpose. Here both appellant and appellee admit that they knowingly and willfully executed the contract as a binding instrument irrespective of the statute and of any future action of the CAB. The fact that National could have subsequently divested itself of the Caribbean shares by a sale to a third person

would furnish only a convenient method for evasion of the statute. Regents of University System of Georgia v. Carroll, 338 U. S. 586, 70 S. Ct. 370 (1949), is not applicable, because the Federal Communications Act did not expressly declare the stock purchase agreement there in question to be unlawful. The Federal Communications Commission operates under a statute which confines its powers substantially to the grant and denial of licenses. Its order holding improper that contract was an administrative interpretation of the Communications Act. The Civil Aeronautics Act is considerably broader and is specific with reference to the ''unlawful'' nature of the contract here involved.

Affirmed.

*McGehee, C. J.,* and *Lee, Arrington* and *Gillespie, JJ.,* concur.