599 So.2d 966 (1992)
L.H. MARTIN
v.
ESTATE OF W.W. MARTIN, Jr., Deceased.
No. 89-CA-0668.
Supreme Court of Mississippi.
April 22, 1992.
Rehearing Denied June 17, 1992.
Guy M. Walker, II, Laurel, for appellant.
Anthony L. Thaxton, Gilchrist Sumrall Thaxton & Yoder, Laurel, for appellee.
Before DAN M. LEE, P.J., and ROBERTSON and McRAE, JJ.
ROBERTSON, Justice, for the Court:

I.
This is a simple suit on a note. It seems the proceeds of a predecessor note were used in the original maker/bank president's efforts to deceive FDIC bank examiners. The maker of today's note assumed the obligations of the original note, and his estate defends on grounds the note was tainted with illegality. The Chancery Court credited the defense.
We reverse, for reasons presently set forth.

II.

A.
This case has its genesis a decade ago amidst the myriad problems of the Merchants and Manufacturers (M & M) Bank of Ellisville, a state-chartered but Federal Deposit Insurance Corporation (FDIC) insured banking association. The play opens in 1982 with a cast of three characters. Garey C. Holifield was chief executive officer (CEO) and chairman of the board of directors of the M & M Bank. W.W. (Woody) Martin, Jr., was president of the bank's holding company and voted a controlling interest in the bank's shares and *967 was also a member of the board of directors. L.H. Martin was a successful businessman, largely in oil and gas ventures, and also served as a member of M & M Bank's board of directors.
L.H. Martin was the Plaintiff below and is the Appellant here. W.W. Martin, Jr., was the original Defendant below. His estate became substituted as Defendant in the Chancery Court and is Appellee here.

B.
State and FDIC bank examiners descended upon the M & M Bank in December of 1982, after learning that the Bank had paid off a number of questionable loans the Bank of Mantee had made to various officers of The Mississippi Bank. It seems the Bank of Mantee and the M & M Bank had common ownership, and apparently loans were being moved between the banks to avoid FDIC scrutiny. The FDIC and state bank examiners pored over the Bank's books and records and found "insider loans," the details of which are unimportant, except that several weeks later FDIC "classified" at least three of these loans and issued a cease and desist order requiring the M & M Bank to end these illegal transactions. The Bank made certain commitments, among which was that the outstanding balance on the classified loans would be promptly reduced.
In point of fact, the debtors on these loans were unable to respond, a fact CEO Holifield well knew. In May of 1983, Holifield approached L.H. Martin and asked if he could personally borrow from Martin $100,000.00 for a short period of time, with the understanding that the money be "used in the bank." Martin agreed. At the time, Martin had approximately $70,000.00 in cash in a safety deposit box. The remainder of the money was provided via a $40,000.00 loan the Bank made to DAPSCO, a closely held corporation controlled by L.H. Martin. Martin would somehow get his hands on $30,000.00 of the DAPSCO money and loan it to Holifield.
The transaction was consummated on May 25, 1983. L.H. Martin delivered to Holifield $100,000.00 in cash. Holifield made and delivered two unsecured promissory notes payable to L.H. Martin, the first in the principal amount of $70,000.00 without interest, and the second for $30,000.00 with interest at 13.5 percent per annum  the rate DAPSCO was paying on its loan from the Bank. Each note was payable six months from date.
Holifield took the $100,000.00 and placed it in a safety deposit box, where it remained for some time. Without question, Holifield intended to use the money to apply to the classified loans so, when FDIC examiners reappeared, he could show progress being made in collecting certain classified loans. And, indeed, about a month later, Holifield used the money to "reduce" the outstanding balances on three such loans.
It is not clear what Holifield did next, but we do know, in the Fall of 1983, FDIC reappeared and in December, 1983, demanded that the Bank remove Holifield as its CEO. Holifield and the Bank acquiesced, and it was arranged that W.W. Martin, Jr., would become the Bank's new CEO. Garey Holifield, on the other hand, resigned as CEO but assumed Martin's prior position of president of the Bank holding company. During this period of time, W.W. Martin, Jr., learned of the loan L.H. Martin had made to Holifield and orally assured L.H. Martin that he, W.W. Martin, Jr., would be responsible for payment of Holifield's notes.
Things went from bad to worse, and, at CEO Martin's insistence, Holifield resigned as president of the holding company on February 2, 1984, and severed all other Bank ties. In exchange for his resignation, Holifield asked that W.W. Martin, Jr., assume the notes he had given L.H. Martin and that the Bank release him, Holifield, from any liabilities thereon. W.W. Martin, Jr., agreed. He and Holifield then met with L.H. Martin, who acquiesced, and on that date W.W. executed the note upon which the present action is based  a new note entirely in W.W.'s handwriting and in the following form:

*968 PROMISSORY NOTE
February 2, 1984.
I, W.W. Martin, Jr., promise to pay L.H. Martin $30,000.00 plus interest at 13.5 percent per annum from 5/25/83 to May 2, 1984.
Also, I, W.W. Martin, Jr., promise to pay L.H. Martin $70,000.00 in cash at zero interest rate due and payable on February 2, 1985.
 s/W.W. Martin, Jr.
 s/Garey C. Holifield
 Witness
W.W. Martin, Jr., then delivered this note to L.H. Martin, who also retained the original Holifield notes.[1]
February 2, 1985, came and passed, and W.W. Martin, Jr., made no payment on the note. L.H. Martin from time to time inquired, and W.W. told him he did not have the money.

C.
On February 28, 1986, L.H. Martin commenced the present proceedings by filing his complaint in the Circuit Court of Jones County, exhibiting the February 2, 1984, note(s) and demanding judgment against W.W. Martin, Jr., in the amount thereof. In March of 1986, W.W. Martin, Jr., made two $5,000.00 payments to L.H. Martin, both of which were applied to the $70,000.00 note. Nothing of consequence occurred until June 29, 1986, when W.W. Martin, Jr., died of a self-inflicted gunshot wound.
In due course, Joan Gatlin Martin approached the Chancery Court of Jones County and was appointed executrix of the last will and testament of W.W. Martin, Jr. L.H. Martin then probated a claim based on the note he held. Soon thereafter, the Circuit Court action was abandoned, and the matter proceeded to trial in the Chancery Court. That Court found that Holifield was engaged in illegal efforts to deceive FDIC examiners regarding the M & M Bank's classified loans, and that Holifield's original note to L.H. Martin, as well as its assumption and renewal by W.W. Martin, Jr., were part and parcel of the illegal scheme, by reason of which "the notes would be void as a matter of public policy." The Court further held that, to permit L.H. Martin
to prevail would lend the aid of the courts of this state in enforcing a scheme to deceive the FDIC in enforcing the banking laws and regulations.
The Court then dismissed L.H. Martin's claim with prejudice.
L.H. Martin now appeals to this Court.

III.
The promissory note L.H. Martin has exhibited is complete and regular on its face. It is enforceable according to its terms, unless the estate has some defense cognizable in law. Payment is a defense to the first $10,000.00 of the note, because we know Woody Martin paid that amount before he took his life. The question is whether there are further defenses.
A note is a contract, and this state has long recognized that contracts against public policy are unenforceable. See, e.g., First National Bank of Vicksburg v. Caruthers, 443 So.2d 861, 864, n. 3. (Miss. 1983). Where, as here, the maker of a note takes such a view, he must say so affirmatively by way of defense. Rule 8(c), Miss. R.Civ.P.; Hertz Commercial Leasing v. Morrison, 567 So.2d 832, 834 (Miss. 1990) (citing cases). The Martin Estate did so here, and persuaded the Chancery Court, which held Holifield's plan illegal and that L.H. Martin was part and parcel of it from the beginning.
We know of no talismanic test whether a contract offends public policy. See Restatement (Second) of Contracts §§ 178, et seq. (1981).
Long ago we drew a distinction between contracts integrally a part of illegal conduct and those separate contracts lawful in and of themselves and supported by a distinct and lawful consideration. Holt v. Barton, 42 Miss. 711, 714-15 (1869); Green *969 v. Sizer, 40 Miss. 530, 559 (1866); see also, Armstrong v. Toler, 24 U.S. (11 Wheat.) 258, 6 L.Ed. 468 (1826). Closer to today's setting, we find the line drawn between knowledge of a borrower's (Holifield's) illegal purpose and direct participation in the illegal use of the money loaned. 15 Williston on Contracts § 1755, pp. 179-80 (3d ed. 1972).
In Smith v. Simon, 224 So.2d 565 (Miss. 1969), we listed several occasions wherein we have pretermitted enforcement of otherwise valid contracts, viz.
(1) when the principal purpose of the contract directly furnishes aid and protection to an illegal enterprise, Smith v. Maryland Casualty Co., 252 Miss. 81, 172 So.2d 574 (1965), involving fidelity bond covering employees who misappropriated illegal liquor; (2) when in order to enforce the contract a party must base his cause of action on his own illegal act, Capps v. Postal Telegraph-Cable Co., 197 Miss. 118, 19 So.2d 491 (1944), involving failure to deliver a telegram concerning a gambling contract; (3) where the contract itself is unlawful, Powelson v. National Airlines, 220 Miss. 595, 71 So.2d 467 (1954), involving a contract to purchase stock in violation of a federal statute, and Morrissey v. Bologna, 240 Miss. 284, 123 So.2d 537 (1960), involving an indebtedness for illegal liquor.
Smith, 224 So.2d at 566.
Smith's categories (2) and (3) have no force today. L.H. Martin is not basing his claim on any illegal act of W.W. Martin, Jr. (or, for that matter, of Garey C. Holifield). L.H. Martin need prove no illegal conduct to make his case. He says he made a loan of $100,000.00, that W.W. Martin assumed the loan and has paid only $10,000.00 of it. The note(s) themselves are certainly not unlawful.
Even turning to Smith category (1), not every contract facilitating a fraud falls under this rule. Where the contract on its face is without taint, we will not necessarily withhold enforcement because some unlawful end is thereby made possible. For example, we have enforced fire and property loss insurance policies though the insured premises had been used as a house of prostitution. American Equitable Assur. Co. v. McWhirter, 160 Miss. 216, 133 So. 664 (1931); Conithan v. Royal Ins. Co., 91 Miss. 386, 45 So. 361 (1908). And we have enforced a lease agreement though the demised premises had been used as a restaurant that regularly sold to its customers (then) illegal intoxicating liquors. Smith v. Simon, 224 So.2d at 567.
L.H. Martin struggles mightily to persuade us he knew nothing of Holifield's doings and that, as an unlearned oil and gas entrepreneur, he had no understanding of banking matters. The argument leaves us cold. It is enough that L.H. was a director, a fiduciary of the bank, and as such, owing the bank a duty of reasonable inquiry regarding its affairs.[2] But in the view we take, it matters not that L.H. may have known everything.[3] In making his loan, he incurred no risk beyond Holifield's insolvency.
That Holifield may have had some nefarious purpose ab initio is beside the point, as is the fact he may have taken the money he borrowed from L.H. Martin and used it to some impermissible end. Our case turns on the fact that Holifield's original note to L.H. Martin was not a transaction illegal or against public policy, nor was W.W. Martin's assumption and renewal thereof. Neither required an illegality on anyone's part. The essence of the transaction was a personal loan, evidenced by a promissory note, without written legal limits on the borrower's use of the loan proceeds. All L.H. Martin asks is that the Court order the maker's estate to pay the maker's note according to its tenor.
The W.W. Martin Estate argues this scheme violated a number of federal banking laws and regulations, including 18 *970 U.S.C. §§ 1001, 1005 and 1007. What needs emphasis, however, is that there was not a thing wrong with Gary Holifield personally paying  and thus "reducing" outstanding balances  on the three classified loans, in part or in whole! What was wrong was for Holifield, however he got the money ab initio, to "reduce" these loans and, as soon as the bank examiners left, take his money back. Had L.H. Martin had any personal participation in retrieving the money after the examiners had been deceived, we could well have a horse of a different color. The fact that L.H. Martin has not been paid is the best possible evidence he was not privy to Holifield's post-examination withdrawal of the amounts deposited to "reduce" the classified loans.
The W.W. Martin Estate makes much of its view the Bank could not have lawfully borrowed money from an individual. This may be so, but the point is of no consequence. Consider, e.g.,
A, B, and C, directors of a bank, make notes payable to the bank in order to deceive the bank examiner. They agree that the notes shall be returned and cancelled after they have served their purpose. Enforcement of the promises of A, B and C embodied in the notes is not precluded on grounds of public policy.
Restatement (Second) of Contracts § 178, Illustration 19 (1981).
The Court below relies on Federal Deposit Insurance Corp. v. de Jesus Velez, 678 F.2d 371 (1st Cir.1982), as support for its holding the W.W. Martin, Jr., note unenforceable. We have read the case with care. If L.H. Martin were trying to get back from the Bank what he first loaned Garey Holifield, de Jesus Velez would pose a formidable obstacle. De Jesus Velez, and its principal precedential pillar, D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp., 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), present law protecting banks, their depositors and the FDIC, but do not speak to personal dealings of one bank official with another, except insofar as the bank itself is prejudiced.

IV.
The W.W. Martin Estate argues the note was unenforceable for want of consideration. We disagree. W.W. Martin, as CEO of the M & M Bank, approached Gary Holifield in February of 1984 and asked that Holifield resign as president of the holding company and sever all ties with the bank. With reason Holifield asked, if he were going to take this step, that W.W. Martin, Jr., assume responsibility for payment of the loans he had obtained from L.H. Martin. Moreover, Holifield's notes to L.H. Martin were past due. L.H. Martin forbore to pursue Holifield because W.W. Martin, Jr., assumed the notes. See Duckworth v. Allis-Chalmers Manufacturing Company, 247 Miss. 198, 204, 150 So.2d 163, 165 (1963).

V.
The W.W. Martin Estate defends further on ground W.W. was but a surety or guarantor and, upon his demand, L.H. Martin became obligated to pursue Holifield first. The point is specious. On these facts, W.W. Martin, Jr., was the maker of the February 2, 1984, note(s), and his estate is primarily liable thereon. Peoples Bank & Trust Co. v. Garner, 218 Miss. 72, 65 So.2d 273 (1953).

VI.
Finally, the Court below found illegality in the Bank's original loan to DAPSCO:
The $30,000 note involves a separate transaction between M & M Bank and DAPSCO, a corporation principally owned by a Director of the Bank, L.H. Martin... . Such loans are regulated by federal and state banking law. Such loans must be approved by the other Directors. FDIC Regulation, 12 C.F.R. § 337.3 (1988) and Miss. Code Ann. § 81-5-51 (1972). No authority from the other Directors was obtained. Holifield approved a loan from M & M Bank to DAPSCO, a closely held corporation of Director Martin, for $40,000, and $30,000 of that amount was immediately transferred to CEO Holifield to be used in the bank.
*971 It may well be that the Bank is subject to censure for this transaction. It may even be that DAPSCO may be called to account. As a director, L.H. Martin might be responsible for any loss caused the Bank. But none of this has anything to do with anything in the present context where what  and all  we address is whether the Martin Estate must pay the note L.H. Martin holds. If this be seen a case where the Court orders honor among thieves, so be it.

VII.
Without further ado,[4] we hold the note(s) W.W. Martin, Jr., gave L.H. Martin on February 2, 1984, enforceable according to its tenor. We reverse the judgment below and remand for further proceedings consistent with this opinion.
REVERSED, RENDERED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
NOTES
[1] It is not clear whether L.H. Martin released Holifield from his obligations on the original May 25, 1983, notes. Nothing today turns on the point, and we pursue it no further.
[2] See American Law Institute, Principles of Corporate Governance: Analysis and Recommendations, § 4.01(a)(1) and (c)(2) (Proposed Final Draft, March 31, 1992).
[3] In point of fact, the evidence suggests  and the Court below found  that L.H. Martin knew much more than he admits.
[4] We do not consider whether W.W. Martin, Jr.'s February 2, 1984, note(s) may be said to have "paid" Holifield's original May 25, 1983, notes, nor do we consider whether W.W. Martin, Jr., in making his 1984 note with knowledge of Holifield's note, its original purpose, and Holifield's use of the proceeds thereof, waived the illegality defense now asserted. No one has suggested these points.