McMILLIN, C.J., for the court.
¶ 1. Jim Aron filed suit against Andrew J. Reid in the Chancery Court of Calhoun County alleging that he held a partnership interest in a convenience store business operated by Reid in Calhoun City. Among *109 other forms of relief, Aron sought an accounting for all profits generated from the operation of the enterprise from its inception together with a determination that he was entitled to a judgment for one-half those profits. Reid answered and denied that Aron owned any such interest in the business. Additionally, he filed a counterclaim seeking cancellation of a recorded quitclaim deed that, on its face, appeared to be a conveyance by Reid to Aron of a one-half interest in the real property on which the business was situated. Reid alleged that he never intended to make such a conveyance and that his signature on the instrument was either a forgery or obtained by trick and deception.
¶ 2. At the conclusion of the proof, the chancellor held that Aron had failed to carry his burden of proof to establish ownership of an interest in the business enterprise. He also granted Reid relief on his counterclaim and ordered the disputed quitclaim deed struck from the land records of the county, finding that Reid’s signature on the instrument was not genuine.
¶ 3. From that judgment, Aron perfected this appeal in which he raises four issues. Those issues are (a) that the chancellor erred as a matter of law in setting aside the deed in favor of Aron, (b) the chancellor erred in not barring Reid’s counterclaim to set aside the deed on the equitable doctrine of laches, (c) the chancellor was manifestly in error in failing to find that Reid held title to the business assets in a constructive trust in favor of Aron, and (d) the chancellor erred in determining that Aron failed to meet his burden of proof to establish an ownership interest in the convenience store. We find the issues raised on appeal to be without merit and affirm the decision of the chancellor.
I.
Facts
¶ 4. Essentially all of the evidence presented at trial bearing directly on the critical issues before the court came from the testimony of Aron and Reid. They gave markedly different versions of the events, which we will briefly summarize, beginning first with Aron’s version.
A.
Plaintiff Aron’s Evidence
¶ 5. Aron claimed that he and Reid located a lot in Calhoun City that would be suitable for operation of a convenience store that dispensed gasoline products. Aron also located a metal building in another city that could be dismantled and transported to the business site and would serve to house the business. Aron and Reid purchased the building together, with each paying one-half the purchase price. Aron assumed much of the responsibility for these aspects of the prospective operation, including the dismantling and removal of two existing structures on the Calhoun City site to facilitate the erection of the new building.
¶ 6. The agreement between Aron and Reid was that Reid’s wife would assume the day-to-day management of the business, for which she would be entitled to a reasonable salary, and that any profits remaining thereafter would be divided equally between the two principals.
¶ 7. No written instruments were executed evidencing this agreement and the title to the real property was taken solely in the name of Reid. Aron attempted to explain this by testifying that he had recently been through some difficulties with federal law enforcement officers and that he was under a watchful eye from that source. He explained that he and Reid had arrived at a scheme whereby Aron *110 would secretly supply tax-exempt diesel fuel intended for off-road use for resale to the general public for over-the-road use, thereby permitting substantially greater profits than would be available to a legitimately operated business engaged in the sale of diesel fuel. Aron indicated that he desired to keep his name off any aspect of the business for fear that it would attract the attention of the federal authorities.
¶ 8. In the course of setting up the business, Aron and Reid borrowed the sum of $25,000 from a local businessman under a repayment agreement that called for weekly payments with Aron to pay one week and Reid to pay the next. The repayment of the money was informally secured by the delivery to the businessman of an unrecorded quitclaim deed from Reid to Aron of a one-half interest in the business property along with a second quitclaim deed to the same one-half interest executed by Aron with the name of the grantee left blank. Apparently, the intentions of the parties were that, in the event of default, the lender could insert his name in the second deed and record both instruments, thereby vesting him with a one-half interest in the property.
¶ 9. Soon after the business was set up, Aron was incarcerated on charges unrelated to this case and, thus, lost day-to-day contact with the business. This prevented Aron from going through with the plan to surreptitiously furnish tax-exempt diesel fuel for resale at the higher over-the-road prices and Reid proceeded to obtain diesel fuel from another source. Aron’s imprisonment also caused some delay in the repayment of his one half of the $25,000 loan; however, after his release, he was able to ultimately pay his part, at which time the businessman delivered back to Aron the quitclaim deed from Reid and Aron had the deed filed for record.
¶ 10. Aron’s repeated demands to Reid for a full accounting of the business operation during his period of incarceration were met with stalling tactics and promises by Reid that his wife had the necessary figures and would ultimately come up with a proper accounting for profits. Finally, feeling dissatisfied with Reid’s empty promises, Aron filed this action.
B.
Defendant Reid’s Version
¶ 11. Reid became interested in the Calhoun City lot to open a second convenience store to complement his operation in the city of Bruce. He purchased the lot by financing it with a loan from a commercial bank. Aron, in the meantime, located a building suitable for the operation and Aron and Reid bought the building as a joint venture with Aron taking principal responsibility for moving the building to the Calhoun City lot. Subsequently, the parties reached an agreement whereby Aron would receive the two existing structures on the lot in exchange for his half interest in the new building and as compensation for his efforts in moving the building. The smaller of the two existing buildings was sold by Aron to a third party for several thousand dollars on the condition that it be promptly removed. Aron retained all of that money. The second, and larger, of the two existing buildings was dismantled by Aron and re-erected on another lot owned solely by Aron. Aron subsequently found a tenant for this building and leased it, receiving all of the rental proceeds from that arrangement.
¶ 12. Reid contracted with a petroleum distributor to install gasoline pumps, tanks and related facilities for the sale of gasoline, but that distributor was doubtful that the business could do sufficient volume of diesel sales to warrant installing the necessary storage and pumping equipment. As *111 a result, Aron and Reid reached a separate agreement whereby they would jointly borrow the money to purchase and install diesel storage and pumping facilities and Aron would furnish diesel for sale, paying Reid a five cents per gallon commission on all diesel fuel sold on the premises. It was in furtherance of this undertaking that the $25,000 loan described above was obtained. Later, however, Aron asked Reid to purchase his one-half interest in the diesel storage and dispensing equipment and Reid obliged by issuing Aron a check for $13,500, representing half the loan plus half the agreed interest totaling $2,000 that the lender had required. Aron continued for a few months to furnish diesel fuel until Reid subsequently discovered that, without his knowledge, Aron had been delivering tax-exempt diesel fuel for sale on the premises, thereby permitting Aron alone to obtain excessive profits from the sales since he got the entire purchase price from diesel fuel sales save for the flat five cents per gallon commission allowed to Reid. Upon making that discovery, Reid ceased doing business with Aron. Reid was able to convince his gasoline supplier, based on actual sales figures since opening the business, that diesel fuel sales were now economically feasible. That supplier purchased the diesel fuel dispensing and storage equipment from Reid and entered into an agreement typical for such businesses whereby the equipment would remain on the premises, the supplier would keep a supply of diesel fuel in storage that Reid would sell to the general public, holding the sale proceeds in trust for the supplier. In exchange for effectuating these sales and accountings to the supplier for the sale proceeds, Reid would be entitled to deduct a sales commission for himself. Upon receipt of the sale proceeds, Reid paid off the balance of the amount he owed on the $25,000 loan.
¶ 13. After initially suggesting that Aron might have obtained Reid’s signature on the disputed quitclaim deed by some sort of trick, Reid testified unequivocally that he did not believe the signature on the deed to be his. He testified concerning certain characteristics of the signature that did not match his actual writing. Additionally, he called several family members who testified to their familiarity with Reid’s handwriting and who indicated that the questioned signature did not appear to be that of Reid.
¶ 14. The notary public who had acknowledged Reid’s signature on the deed was, according to the proof, Aron’s daughter who was employed by him at the time the deed was purportedly executed. At trial, she did not ever testify directly that she remembered Reid signing the deed in her presence or acknowledging the genuineness of the signature in her presence. All she would testify to was the fact that, if she had acted as notary public in the acknowledgment, then Reid would have signed it in her presence. Several members of Reid’s family, however, testified to having confronted the daughter shortly after the instrument was discovered to have been recorded and that, at that time, she conceded that she had not witnessed Reid’s execution of the instrument.
II.
The Chancellor’s Decision
¶ 15. The chancellor, after hearing these sharply contrasting versions of the events leading up to this litigation, determined that the evidence offered by Reid was more credible than that offered by Aron. He found that Aron had failed in his burden to offer evidence found persuasive to the chancellor that he did, in fact, surreptitiously own a one-half interest in the Calhoun City convenience store operation or any part of the assets of that business. The chancellor further held that Reid had *112 shown by clear and convincing evidence that the signature on the purported quitclaim deed to Aron was not that of Reid and that the instrument should be canceled as a cloud on Reid’s title to the property.
III.
The Issues and Our Scope of Review
¶ 16. Though Aron, in his brief, attempts to raise his various issues as errors of law, we conclude that they are, in actuality, allegations that the chancellor’s findings of fact were contrary to the credible evidence presented at trial. These issues relate to the chancellor’s decision to set aside the quitclaim deed and his decision that Aron had not satisfactorily proven an ownership interest in the business operation itself. In point of fact, the two issues relating to Aron’s alleged secret ownership of an interest in the business operation appear to raise the same issue, which is whether the chancellor’s findings of fact are supported by substantial evidence in the record. Such determinations by the chancellor, sitting as finder of fact, are subject to a narrow review on appeal that limits this Court to an inquiry as to whether the chancellor abused his discretion in determining the actual facts as he believed them to be on sharply conflicting evidence. Madden v. Rhodes, 626 So.2d 608, 616 (Miss.1993). While the standard is that evidence to set aside a deed apparently valid on its face must be clear and convincing (see Culbreath v. Johnson, 427 So.2d 705, 707 (Miss.1983)), the chancellor’s view of what evidence presented appeared more probative and persuasive in determining whether that burden was met is entitled to substantial deference when reviewed on appeal.
IV.
Cancellation of Quitclaim Deed
¶ 17. Reid testified that, upon examination, he was convinced that the signature on the quitclaim deed purported to be his was not genuine. In all events, he testified that no matter how the signature on the deed was produced, he never intended to convey any interest in the property to Aron and never agreed to make such a conveyance. Other family members familiar with Reid’s handwriting offered their opinions that the signature on the deed, though bearing some similarity to Reid’s, did not appear authentic.
¶ 18. The deed in question bore on its face an execution date of March 21, 1989, but Aron did not record the instrument on the land records of Calhoun County until December 28, 1993. His explanation for the delay was suspect, involving as it did an alleged scheme to hide his involvement in the business so that he and Reid could engage in a tax-avoidance scheme and thereby reap unwarranted profit from the sale to the motoring public of untaxed diesel fuel intended for off-road use. Reid denied any such scheme, testifying that under their marketing agreement, he received only a flat five cents per gallon commission that would have been unaffected by whether or not the diesel fuel had been properly taxed, and that he promptly severed his marketing relationship with Aron when he discovered that Aron was secretly providing untaxed fuel to the business. The chancellor’s decision to believe Reid’s version of the facts is, on appellate review, entitled to deference. Collins v. McMurry, 539 So.2d 127, 129 (Miss.1989). Conceding that deference to the chancellor’s fact-finding, this Court concludes that Reid’s version is entirely plausible, not impeached or contradicted by any objective evidence to any marked degree. It is, therefore, beyond our authority to disturb the chancellor’s decision to rely on that evidence as the more trustworthy in deciding the case.
*113 ¶ 19. Any presumption arising out of the fact that the deed appeared on its face to be properly acknowledged before an officer authorized to acknowledge such instruments for recording (see Greenlee v. Mitchell, 607 So.2d 97, 107 (Miss.1992)) was, in the view of this Court, substantially weakened by evidence that the acknowledging official was Aron’s daughter who was an employee at the time and who had, in the past, made statements regarding the circumstances of the deed’s acknowledgment that did not entirely square with her testimony at trial. In the circumstances of this case, we conclude that the evidence calling the deed into question was substantial enough to overcome any presumption of validity arising solely out of the fact that the instrument appeared on its face to be properly acknowledged. We further conclude that the evidence could properly be construed as rising to the level of clear and convincing evidence of the invalidity of the instrument. Thompson v. Shell Western E & P, 607 So.2d 37, 40 (Miss.1992). In that circumstance, we find no basis to disturb the chancellor’s decision.
V.
Laches
¶ 20. Aron recorded the 1989 deed on December 28,1993. Reid testified that he first discovered the existence of the recorded deed, which he considered not to be legitimate, on or about 1995, when he discovered Aron’s name on his tax notice from the Calhoun County Tax Assessor. He did not formally commence any legal action to set aside the deed, however, until December 11,1998, when he filed his counterclaim in this action. Aron now claims that this long delay should constitute an equitable bar to pursuing such a claim under the doctrine of laches, an equitable doctrine that prevents one from pursuing a claim after an inordinate and unjustified delay that works to the disadvantage of the responding party. Allen v. Mayer, 587 So.2d 255, 260 (Miss.1991).
¶ 21. Such a defense is in the nature of an affirmative defense that must be affirmatively pled. M.R.C.P. 8(c). Aron did not plead the defense in his answer, nor did he actively assert a claim of laches at the trial of the cause. Rather, he attempts to raise the issue for the first time on appeal, a practice that is not permitted since it is the role of an appellate court to review alleged errors committed during the trial of the case rather than to consider matters, however meritorious, that were not presented to the trial court for consideration. Read v. Southern Pine Elec. Power Ass’n, 515 So.2d 916, 921 (Miss.1987). On that basis, we decline to consider Aron’s arguments concerning the application of the doctrine of laches.
VI.
Aron’s Claim of Ownership in the Business Enterprise
1122. Separate and apart from Aron’s claim of ownership of an undivided one half interest in the real property is his claim that he also owned a one half interest in the business operation conducted on the premises and was, as a result, entitled to a full accounting for the store’s financial operation since its beginning together with a judgment for one half of any profits demonstrated to have been generated by that accounting.
¶ 23. The chancellor heard sharply contradictory evidence on the question. No documentary evidence was produced by Aron that would tend to establish the validity of his claim. Rather, his claim was based solely on his own credibility in asserting secret ownership purposely concealed for the purpose of avoiding detec *114 tion of a wrongful scheme to increase the store’s profitability by selling untaxed diesel fuel to the unsuspecting motoring public. Leaving aside issues of whether the chancery court, as a court of equity, will lend its assistance to the enforcement of agreements to carry out improper or illegal activities (see Martin v. Estate of Martin, 599 So.2d 966, 968 (Miss.1992)), the chancellor was left with the fundamental question of whether he found Aron’s evidence more credible than that produced by Reid.
¶24. The chancellor specifically concluded that Aron’s evidence was not credible and, on that basis, denied his claim to an ownership interest in the business enterprise. That determination of the proper resolution of sharply contrasting versions of the facts by the chancellor is entitled to substantial deference by this Court when reviewing the matter on appeal. Madden v. Rhodes, 626 So.2d 608, 616 (Miss.1993). As in our review of the evidence relating to the quitclaim deed’s validity, we do not find Aron’s evidence so compelling nor do we find Reid’s contradictory evidence so unworthy of belief as to lead us to the conclusion that the chancellor abused his discretion in resolving the dispute in Reid’s favor.
¶ 25. For that reason, we find nothing in the claims regarding Aron’s purported ownership interest that would require us to disturb the chancellor’s findings.
¶26. Aron’s separate issue claiming that Reid was holding his share of the profits in an alleged constructive trust for Aron’s benefit depends for its vitality on the threshold determination that Aron did, in fact, have some legal or equitable ownership interest in the business. Since that question was decided against Aron by the chancellor-a decision which we have upheld-his arguments regarding an alleged constructive trust are plainly without any independent merit.
¶ 27. THE JUDGMENT OF THE CHANCERY COURT OF CALHOUN COUNTY IS AFFIRMED ON DIRECT AND CROSS APPEALS. COSTS OF THE APPEAL ARE ASSESSED TO THE APPELLANT.
KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, IRVING, MYERS, AND BRANTLEY, JJ., CONCUR. CHANDLER, J., NOT PARTICIPATING.