**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-2098

CENTENNIAL BROADCASTING, LLC,

Plaintiff - Appellee,

versus

GARY E. BURNS; 3 DAUGHTERS MEDIA,
INCORPORATED,

Defendants - Appellants.

Appeal from the United States District Court for the Western District of Virginia, at Lynchburg. Norman K. Moon, District Judge. (6:06-cv-00006-nkm)

Submitted: September 19, 2007      Decided: November 16, 2007

Before WILLIAMS, Chief Judge, SHEDD, Circuit Judge, and Joseph F. ANDERSON, Jr., United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

Mark J. Prak, Coe W. Ramsey, Charles E. Coble, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Raleigh, North Carolina, for Appellants. Virginia W. Hoptman, Jerry W. Boykin, Erin Roberts, WOMBLE, CARLYLE, SANDRIDGE & RICE, Tysons Corner, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellants Gary E. Burns and 3 Daughters Media, Inc. ("3 Daughters") (collectively "Appellants") appeal the district court's grant of a permanent injunction to Centennial Broadcasting, LLC ("Centennial") enforcing a covenant not to compete between Burns and Centennial. Appellants argue that the district court erred in concluding that the covenant's terms are unambiguous and that Burns failed to comply with those terms. They also challenge the validity of the non-competition agreement on a number of grounds. For the reasons that follow, we affirm.

I.

In October 2004, Centennial and Burns entered into an agreement (the "Asset Purchase Agreement" or "APA") pursuant to which Burns was to sell Centennial substantially all of the assets, property, and rights of the radio station WLNI-FM ("WLNI"), "licensed by the Federal Communications Commission ("FCC") to Lynchburg, Virginia."[1] (J.A. at 10.)[2] On February 28, 2005, Centennial closed on the purchase of WLNI for approximately $4.4

_____

[1]The APA initially provided for the sale of two additional radio stations, WMNA-FM and WMNA-AM, "licensed by the FCC to Gretna, VA" (the "Gretna stations") as well. (J.A. at 10.) In January 2005, however, the parties amended the APA to exclude the Gretna stations from the transaction.

[2]Citations to the "J.A." refer to the contents of the joint appendix filed by the parties to this appeal.

2

million. The parties allocated $4.135 million for WLNI's FCC license, $180,000 for the broadcasting equipment, $50,000 for the tower antenna, and $35,000 for office and miscellaneous equipment.

As a condition of the sale, the parties entered into an ancillary agreement entitled the "Non-Solicitation and Consulting Agreement." Centennial paid Burns $25,000 as consideration for his compliance with the covenants contained in the agreement. Only one of the Non-Solicitation and Consulting Agreement's three primary restrictions is relevant to this appeal. Paragraph 2 ("the non-competition agreement") provides that:

> Except as provided in the next sentence, Covenantor [Burns] further agrees that at no time during the Restricted Period will he directly or indirectly, whether as owner licensee, principal, agent, consultant, employee, proprietor, partner, lender, or shareholder, director or officer of a corporation (or similar position in any other entity), or in any other capacity, other than as employee or contractor of Buyer, engage in, own, manage, operate, control or otherwise participate in or be in any manner connected with the ownership, operation, management or control of <u>any commercial AM or FM broadcast business at any radio broadcasting station that is included in the Roanoke-Lynchburg Arbitron Metro radio market if such station utilizes a programming format substantially similar to any format used by the Station on the date Buyer acquires the Station</u>; provided, however, that ownership of less than 5% of the outstanding stock of any publicly traded corporation shall not be prohibited solely by reason thereof. Covenantor's ownership and operation of Radio Stations WMNA-FM and WMNA(AM), Gretna, Virginia, are specifically excluded from the restrictions in this paragraph.[3]

---

[3]The "Restricted Period" represents a five-year period running from the date the parties signed the Non-Solicitation and Consulting Agreement until the fifth anniversary of the closing under the APA.

3

(J.A. at 23 (emphasis added).) At the time of the sale, WLNI's programming consisted primarily of talk shows, although the station also sometimes broadcasted sports events.

In November 2005, Centennial learned through a newspaper article that Burns, acting through 3 Daughters, a company he owns, had purchased the radio station WBLT-AM ("WBLT") in Bedford, Virginia. WBLT's signal reached into the area encompassed by the Roanoke-Lynchburg Arbitron Metro radio market.[4] And, although WBLT had been one of the few music stations remaining on the AM dial, Burns shifted its programming to primarily talk radio upon purchasing the station. Burns told the article's author that he instituted the format change because he had "been very successful with news and talk radio." (J.A. at 40.)

Centennial believed that Burns's operation of WBLT as a talk radio station violated the non-competition agreement. Accordingly, on February 17, 2006, Centennial filed a complaint for damages and injunctive relief against Appellants in the United States District Court for the Western District of Virginia, claiming diversity of citizenship between itself and Appellants and an amount in controversy over $75,000. Centennial's complaint asserted claims

---

[4] "'Arbitron' is a national radio audience measurement company" that relies on biannual "sweeps" of radio listeners to measure the market share of radio stations. (J.A. at 301.) Arbitron defines the Roanoke-Lynchburg radio market "as encompassing the cities of Roanoke, Lynchburg, Bedford, and Salem, and six Virginia counties: Roanoke, Boutetourt, Bedford, Campbell, Amherst and Appomattox." (J.A. at 301.)

against Burns for breaches of the non-competition agreement, the APA, and the APA's implied covenant of good faith and fair dealing (Counts I-III) and a claim against 3 Daughters for violations of Centennial's rights under the APA and the non-competition agreement (Count IV). On the same day, Centennial filed a Motion for Temporary Restraining Order (TRO) and a Motion for Preliminary Injunction enjoining Appellants "from further use of a Talk programming format" on WBLT. (J.A. at 28, 30.)

On March 13, 2006, the district court conducted a hearing on Centennial's motions for a TRO and for a preliminary injunction. Centennial provided evidence that it had monitored WBLT for 24 hours and learned that "it ha[d] 21 hours of syndicated talk and three hours of music." (J.A. at 128.) Moreover, WBLT was "duplicating a number of talk show programs broadcast on WLNI." (J.A. at 35.) Burns did not dispute that a number of the talk programs aired on WBLT were the same as those aired on WLNI. He also admitted that the bulk of WBLT's programming on Monday through Friday was syndicated talk shows. (J.A. at 240.) Burns took issue, however, with Centennial's assertion, grounded in a list of radio formats set forth in "Radio & Records" (which Centennial described as "the leading magazine in the radio industry," (J.A. at 138)), that there existed a single talk radio format which both WLNI and WBLT employed. Burns supplied an article from "Talkers Magazine" (whose slogan is "the [B]ible of the talk radio

5

business," (J.A. at 207)) that "broke[] down on-air talk talent to nine major categories," (J.A. at 73); he argued that each category represented a distinct radio format and that when these categories were used to define WBLT and WLNI's respective formats, the two were not substantially similar. At the close of the hearing, the district court determined that Burns had clearly violated the non-competition agreement and issued a TRO. On March 20, 2006, the district court granted Centennial's motion for a preliminary injunction.

Prior to the March 13, 2006 hearing, the district court had notified the parties that it would "be considering the possibility of consolidating the request for a preliminary injunction with trial on the merits of the request for a permanent injunction," but understood that because expert witnesses might be unavailable at the hearing, the parties might need to submit deposition testimony relevant to the merits within a reasonable period after the hearing.[5] (J.A. at 326.) A subsequent Opinion and Order provided that in considering whether consolidation was appropriate, the district court would consider only the evidence offered at the March 13, 2006 hearing, the deposition testimony of Appellants' expert witness, and Centennial's rebuttal evidence, if any was

---

[5] Pursuant to Fed. R. Civ. P. 65(a)(2), "Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application."

6

offered. If, after considering that evidence, the district court concluded that the language of the non-competition agreement was unambiguous, it would decide the merits of the request for a permanent injunction. If, however, it determined that disposition of the merits required further development of the record, it would permit the parties to conduct further discovery.

Accordingly, Burns submitted the deposition testimony of expert witness Michael Harrison, publisher of "Talkers Magazine." Harrison identified eleven different talk radio formats, but suggested that there were "probably more." (J.A. at 576.) According, to Harrison, "radio is a minute to minute competition," so stations should be compared on a minute to minute basis. (J.A. at 599.) He had not, however, compared WLNI and WBLT in this manner. When asked if it was "a fair statement to say that both of these formats for WBLT and for WLNI are general issues political talk even under [Harrison's] definitions," (J.A. at 612), Harrison acknowledged that "[i]t [wa]s possible," (J.A. at 613), but stated that "it all depends on actually analyzing the actual number of hours that they do the different shows," and that he had not conducted that analysis. (J.A. at 612-13.)

As rebuttal evidence, Centennial submitted the deposition testimony of Walter Sabo, CEO of Sabo Media, a programming and management company specializing in profitable contents solutions for talk-radio stations. Sabo listed five formats that he believed

7

existed within the talk radio format and indicated that there were "probably more." (J.A. at 733.) Sabo opined that WLNI and WBLT had substantially similar formats, basing his conclusion on "[t]wo things" -- "that many of the[] shows cover the same subject area, and . . . the way the shows are scheduled." (J.A. at 707.) He described the content of both stations as being primarily political and the structure of the two stations as "amazingly similar." (J.A. at 709.)

After the deposition testimony was taken, Centennial filed a Motion for a Permanent Injunction Pursuant to [Federal Rule of Civil Procedure] 65(a)(2) and to Render Final Judgment in Favor of Plaintiffs on the Merits. On September 29, 2006, the district court granted Centennial's motion to consolidate trial on the merits with the preliminary injunction hearing and issued an opinion and order permanently enjoining Burns from "participating in or being in any manner connected with the ownership, operation, management or control of any commercial AM or FM broadcast business at any broadcasting station that is included in the Roanoke-Lynchburg Arbitron Metro radio market for a period of five years if that business station uses the following programming formats . . . : All talk, News/Talk, Full Service Talk, or Specialized Talk with a focus on current events and/or politics." (J.A. at 941-42.)[6] 3

---

[6]In crafting the injunction, the district court sought to use terms that reflected Burns's understanding of the different types of radio station programming formats. The district court's Opinion

Daughters Media was permanently enjoined "from the same" so long as Burns remained affiliated with the company. (J.A. at 942.) In a separate order, the district court referred Centennial's claim for costs and attorneys' fees to a magistrate judge.

Burns and 3 Daughters timely appealed the district court's order granting Centennial a permanent injunction. We have jurisdiction pursuant to 28 U.S.C.A § 1292(a)(1) (West 2006).

## II.

"[W]e review the grant of a permanent injunction for abuse of discretion." Virginia Soc'y for Human Life, Inc. v. F.E.C., 263 F.3d 379, 392 (4th Cir. 2001). In so doing, we review the district court's underlying factual findings for clear error and its conclusions of law de novo. Id. "[A] mistake of law by a district court is per se an abuse of discretion." Dixon v. Edwards, 290 F.3d 699, 718 (4th Cir. 2002).

Appellants argue that the district court abused its discretion in granting Centennial a permanent injunction because the district

---

and Order defined, in a footnote, the formats that Burns was enjoined from using. It took both the format categories and their definitions from a website on which Burns had relied in an affidavit supporting his response in opposition to Centennial's motion for a preliminary injunction. In the affidavit, Burns used the website in asserting that "All Talk" and "News Talk" were distinct formats and that WLNI used an "All Talk" format at the time that he sold it. Accordingly, the district court concluded that Burns "accept[ed] [the website]'s breakdown of talk programming formats into All Talk, News/Talk, Full Service, Specialized, and Sports." (J.A. at 933.)

court's decision rests on erroneous legal conclusions. Specifically, Appellants contend that the district court erred in concluding that the non-competition agreement's reference to a "programming format substantially similar [to that of WLNI]," (J.A. at 23), was unambiguous. The ambiguity of the contract language, according to Appellants, not only compels reversal of the district court's conclusion that no reasonable jury could find that WLNI and WBLT did not have substantially similar programming formats, but also renders the non-competition agreement unenforceable as violative of Virginia public policy and Burns's First Amendment rights. Appellants further contend that the Federal Communications Act ("FCA"), 47 U.S.C.A. § 310(d) (West 2001), and FCC decisions and policy preempt enforcement of the non-competition agreement. Because Appellants' contention that the non-competition agreement is ambiguous permeates their arguments on appeal, we first address Appellant's challenge to the district court's conclusion to the contrary before considering the question of preemption.

A.

Because this is a diversity suit, we apply the substantive law of the state of Virginia. See Wells v. Liddy, 186 F.3d 505, 527-28 (4th Cir. 1999).[7] Under Virginia law, when the terms of a contract are clear and unambiguous, the interpretation of those terms

_____

[7]The Non-Solicitation and Consulting Agreement contains a choice of law provision specifying that Virginia law governs the parties' disputes.

10

presents a question of law.  <u>Musselman v. Glass Works, L.L.C.</u>, 533 S.E.2d 919, 921 (Va. 2000).  Whether a contractual provision is ambiguous is also a question of law.  <u>Id.</u>

Virginia considers the language of a contract ambiguous "if it may be understood in more than one way or when it refers to two or more things at the same time."  <u>Video Zone, Inc. v. KF & F Properties, L.C.</u>, 594 S.E.2d 921, 923 (Va. 2004) (internal quotation marks omitted).  "Such an ambiguity, if it exists, must appear on the face of the instrument."  <u>Id.</u> at 924.  "Parol evidence cannot be used to first create an ambiguity and then remove it."  <u>Cohan v. Thurston</u>, 292 S.E.2d 45, 46 (Va. 1982).  Moreover, "a document is not ambiguous merely because the parties disagree as to the meaning of the language employed by them in expressing their agreement."  <u>Amos v. Coffey</u>, 320 S.E.2d 335, 337 (Va. 1984) (internal quotation marks omitted).

Appellants argue that the district court's finding that the relevant sworn statements and expert testimony were "mutually incompatible and irreconcilable" reveals that the term "programming format" in the non-competition agreement is ambiguous.  (J.A. at 939.)  For further support, they cite to <u>F.C.C. v. WNCN Listeners Guild</u>, 450 U.S. 582 (1981), in which the Supreme Court upheld the FCC's decision to abandon regulation of radio station formats, a policy change grounded in part in the difficulty the FCC had experienced in defining and categorizing programming formats.  <u>See</u>

11

Dev. of Policy re: Changes in the Entm't Formats of Broad. Stations, 57 F.C.C.2d 580, 583 ¶ 12 (1976) (concluding that labeling radio station formats is a difficult task because "[d]istinctions in this field are extremely hazy and subjective").

The district court rejected Appellants' invitation to look to external sources, rather than the contract itself, to resolve the issue. It found that "[t]he contract refers to the programming format of [WLNI] on the date of transfer of ownership," and "[o]n that date, [WLNI] had a programming format known to both parties." (J.A. at 939.) Accordingly, the district court concluded that just because "the experts . . . [did] not agree on the proper pigeonhole into which that format should be placed d[id] not make the contract ambiguous." (J.A. at 939.) The court reasoned that "[WLNI]'s format may (or may not) defy categorization, but it is possessed of some format which Burns is forbidden to imitate." (J.A. at 939.) It further determined that the phrase "substantially similar" was unambiguous, as "[i]ts ordinary and plain meaning can be gleaned by resort to dictionary definitions and common usage." (J.A. at 939.)

We agree with the reasoning of the district court. The dictionary defines "format" in the media context as a "general plan of organization, arrangement, or choice of material (as for a television show)." Merriam-Webster's Collegiate Dictionary 492 (11th ed. 2004). The non-competition agreement identified a particular general plan of organization or choice of material --

12

that of WLNI's programming format on the date Burns sold the station to Centennial -- with which both parties were familiar. The difficulty of affixing a mutually-agreeable label to the programming format identified in the non-competition agreement does not render the agreement itself ambiguous.

We also agree with the district court that, however the two stations' formats are categorized, no reasonable jury could find that they are not substantially similar. Appellants argue that, under Harrison's approach to format categorization, the stations' programming formats could be found to differ because Harrison's testimony indicates that WLNI and WBLT broadcasted substantially different programs during as many as eleven hours of the day. They offer no basis, however, on which to refute the district court's finding that because "'programming' is distinct from 'programming format,'" different programs may share the same programming format. (J.A. at 933.) That the two stations did not air the same programs at the same time during a substantial portion of the day does not demonstrate that they do not utilize the same or substantially similar programming formats. The district court found that, under Harrison's approach, "both WLNI and WBLT use a General Issues/Political Talk programming format, because each airs talk shows with current events and politics subject matters for a majority of the time and with significant hour-by-hour overlap." (J.A. at 934.) Appellants' arguments regarding the differences

13

between the particular programs do not render this finding clearly erroneous.

We therefore agree with the district court that Appellants breached the non-competition agreement, and the differences in the format definitions and modes of comparison advanced by the parties do not render the violation any less clear. Because we conclude that the language of the non-competition agreement is unambiguous, we need not address Appellants' argument that, under Virginia law, an ambiguous restrictive covenant offends public policy and cannot be enforced. For the same reason, we decline to address Appellants' contention that the non-competition agreement represents a waiver of their First Amendment rights that cannot be enforced because it is ambiguous.

## B.

We next address Appellants' contention that federal law preempts the enforcement of the non-competition agreement under state contract law. Under the Supremacy Clause, federal statutes and regulations displace conflicting state law. See U.S. Const. art. VI, cl. 2; English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990) (explaining that "state law is pre-empted to the extent that it actually conflicts with federal law"). Such a conflict exists in two circumstances -- where "compliance with both federal and state regulations is a physical impossibility," Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963), and where state

14

law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," <u>Hines v. Davidowitz</u>, 312 U.S. 52, 67 (1941); <u>Gade v. Nat'l Solid Wastes Mgmt. Ass'n</u>, 505 U.S. 88, 103 (1992).

Burns argues that both circumstances are present in this case because enforcement of the non-competition agreement would (1) conflict with and frustrate the purpose of § 310(d) of the FCA and (2) violate the FCC policy of prohibiting contractual restrictions on radio-formatting discretion.  Section 310(d) of the FCA provides that "[n]o construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, . . . to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby."  47 U.S.C.A § 310(d). Further, the FCC has a longstanding policy of requiring that a licensee "retain control over programming content at all times." <u>In re Cosmopolitan Broadcasting Corp.</u>, 59 F.C.C.2d 558, 561 (1976). Accordingly, it will not grant licenses to applicants whose contractual obligations limit their ability to maintain ultimate control over programming decisions.  <u>See</u> <u>Cumulus Licensing L.L.C.</u>, 21 F.C.C.R. 2998, 3005 (2006) (finding that a contractual provision prohibiting a buyer of a radio station (and any successor in interest) from "instituting an adult contemporary or country

15

program format, or any similar or derivative format . . . for a period of five years" improperly infringed upon the buyer's programming responsibilities and conditioning approval of the parties' application to transfer the station's license on the deletion of the restriction).

The district court rejected both arguments. It concluded that neither the FCA nor FCC policy preempts the enforcement of the non-competition agreement, because although the FCC will not approve license applications from or transfers to would-be licensees whose programming discretion is unduly inhibited by contractual terms, no FCC rules or decisions purport to alter state contract law or to bind the courts. (J.A. at 937.) To the contrary, the FCC has stated that "there is no conflict between State and Federal policy as to the covenant not to compete." (J.A. at 937 (quoting In re Roman, 38 F.C.C. 290 (1965)); see also In re Cmty. Broad. of Coastal Bend, Inc., 4 F.C.C.R. 3619, 3621 (1989) (stating that "there is no conflict between state and federal policy as to a covenant not to compete").

Again, we agree with the reasoning of the district court. As the district court explained, the FCC has conditioned approval of license transfers on the transferee's ability to extract himself from non-competition agreements that limit programming discretion precisely because these types of agreements are enforceable. See Regents of Univ. Sys. of Ga. v. Carroll, 338 U.S. 586, 600 (1950)

16

(stating that "[t]he [FCC] may impose on an applicant conditions which it must meet before it will be granted a license, but the imposition of the conditions cannot directly affect the applicant's responsibilities to a third party dealing with the applicant").[8]

Thus, whether the non-competition agreement would unduly infringe upon Appellants' ability to program WBLT was a question for the FCC to resolve in determining whether to approve the transfer of the station's license. It is not a ground to invalidate the non-competition agreement. We agree with the district court that any conflict between 3 Daughters's duties as a licensee and Burns's contractual obligations resulted from Appellants' failure to inform the FCC of the non-competition agreement's restrictions and is thus of their own making. We

---

[8]Appellants rely heavily on In re Citicasters Co., 16 F.C.C.R. 3415 (2001). Citicasters, however, is not contrary to Regents of University System of Georgia v. Carroll, 338 U.S. 586 (1950). In Citicasters, the FCC stated that

> Where a contractual dispute is before a court, the licensee must retain actual control of essential station functions unless the Commission gives prior consent to the assignment or transfer of control of the station. Thus, it is a violation of the Communications Act to invoke remedies for breach, including injunctive or other equitable relief, that impinge on such control, without obtaining prior Commission consent.

16 F.C.C.R. at 3420. That a party may violate the FCA by invoking equitable remedies for breach of contract without obtaining the FCC's consent has no bearing on the enforceability of the underlying contract.

17

therefore conclude that the district court did not abuse its discretion in granting Centennial a permanent injunction.

## III.

In sum, we conclude that the non-competition agreement's reference to a "programming format substantially similar to [that of WLNI on the date of its sale to Centennial]," (J.A. at 23), was unambiguous. We further conclude that no reasonable jury could find that WBLT's format was not substantially similar to WLNI's programming format, and that federal law does not preempt enforcement of the non-competition agreement. Accordingly, the judgment of the district court is

AFFIRMED.